STATE of Minnesota, Respondent,

v.

Steven F. HAMILTON, Appellant.

No. 46557.

Supreme Court of Minnesota.

June 16, 1978.

---

**58**

C. Paul Jones, Public Defender, Rosalie Wahl, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, David W. Larson and Phebe Haugen, Asst. County Attys., Minneapolis, for respondent.

Heard before PETERSON, SCOTT, and IVERSON, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

At a jury trial in district court defendant, Steven F. Hamilton, was convicted of second-degree murder and aggravated robbery. On appeal from the judgment, defendant argues that (1) the trial court lost jurisdiction because the state failed to comply with the Uniform Mandatory Disposition of Detainers Act; (2) the indictment was duplicitous; (3) the trial court erred in admitting hearsay statements by an uncharged accomplice; and (4) the evidence was insufficient to support the jury's guilty verdict as to second-degree murder. We reject these arguments and affirm the conviction.

On March 14, 1973, the date of the homicide, defendant and his half-brother, Derwin Bailey (then age 15), were living at 2719 Aldrich Avenue South in Minneapolis together with Rebecca Sargent; her sister, Beth Sargent; and another woman, Carmen Olson. At that time, Bailey was Carmen Olson's boyfriend. At defendant's trial the Sargent sisters and Carmen Olson testified about defendant's and Bailey's activities at 2719 Aldrich Avenue both before and after the time the homicide occurred.

About 6:30 or 6:45 p. m. on the date of the homicide defendant stated that he was going out to get some money. Bailey stated he would go along. Bailey put on a curly, black "afro-style" wig. Defendant put over his clothing a black cape with gold trim and took a knife with an 8-inch blade from the kitchen drawer and secreted it inside the cape. Defendant and Bailey left the house about 6:30 or 6:45 p. m. according to Beth Sargent and about 7:30 p. m. according to Carmen Olson.

About 6:30 p. m. the same day, Gladys Renna and Lois Hattling (the homicide victim) left their apartment in south Minneap-

olis. They began walking to a demonstration of house-cleaning products which was being held at 2715 Dupont Avenue South, about 3 blocks from the house where defendant and the others were living. As Miss Renna and Miss Hattling were nearing their destination two men approached them. When the men were about 15 feet away they ran up to the women and began grabbing their purses. Miss Renna, who testified at trial, felt something metal at her side. Her purse strap broke and her purse was taken.

Miss Renna did not see what happened to Miss Hattling but saw the two men run away, each carrying a purse. Miss Renna and Miss Hattling ran toward the entryway at 2715 Dupont Avenue, where Miss Hattling collapsed and later died. Miss Renna could not identify the assailants, but she described them as wearing dark clothing and dark hats.

At 7:05 p. m. that evening the Minneapolis Police Department received a call to come to 2715 Dupont Avenue South. Police officers proceeded there and found Miss Hattling near death. After attending to her, they roped off the surrounding area and in doing so found a button in a pool of blood. At trial the button was identified by Carmen Olson as being from the cape she saw defendant wearing when he left the house the evening of the homicide.

At approximately 7:30 p. m. according to Beth Sargent, or 8:15 to 8:30 p. m. according to Carmen Olson, defendant and Bailey returned to 2719 Aldrich Avenue. As defendant came through the kitchen door Beth Sargent saw him carrying a bloody knife. Bailey was extremely upset. According to Carmen Olson, Bailey looked at defendant and said, "Really crazy." Defendant replied, "Nothing's going to happen. She's not going to die." According to Rebecca Sargent, Bailey was crying and said, "He killed her," referring to defendant.

Beth Sargent and Carmen Olson testified that defendant admitted he had stabbed a girl. Carmen Olson testified that defendant stated: "[S]he—the bitch wouldn't let go of her purse, so I stuck the knife in her side. And when I felt it—after it went through the coat and broke her skin, I pulled it out again." Later that evening the group at 2719 Aldrich Avenue watched a television news report concerning the homicide, and defendant told the Sargent sisters and Carmen Olson not to discuss it, threatening them with harm if they did.

The events which led to defendant's indictment began more than a year after the homicide took place. In July 1974 Carmen Olson broke off her relationship with Bailey, which led him to assault her. She made a statement to police in connection with the assault which implicated defendant and Bailey in the robbery of Miss Renna and the robbery and murder of Miss Hattling. In October 1974 statements were taken from the Sargent sisters, who had moved to California. Defendant was indicted on February 25, 1975, while serving a term in Stillwater Prison on an unrelated conviction.

1. We turn first to the central issue of the case, whether the Uniform Mandatory Disposition of Detainers Act required the trial court to dismiss the indictment against defendant because of delay in bringing him to trial. The act, which has been adopted in this state as Minn.St. 629.292,[1] allows persons imprisoned in Minnesota to request disposition of any untried indictment or information which is pending against them in Minnesota.[2] To invoke the act the inmate requests a disposition of pending charges, which is sent to the commissioner of corrections. The commissioner certifies that the person making the request is an inmate and sends copies of the request and certification to the court in which the indictment or information is pending and to the official charged with prosecuting it. Section 629.-

1. Laws 1967, c. 294. The Uniform Mandatory Disposition of Detainers Act was promulgated in 1958 and has also been adopted in six other states. 11 U.L.A. 321.

2. A companion statute, the Interstate Agreement on Detainers, adopted in Minnesota as Minn.St. 629.294, concerns detainers filed against Minnesota prisoners by other states.

292, subd. 1(a). The act then specifies the period during which the pending charges must be brought to trial:

"Subd. 3. *Within six months after the receipt of the request and certificate by* the court and prosecuting attorney, *or within such additional time as the court for good cause shown in open court may grant,* the prisoner or his counsel being present, *the indictment or information shall be brought to trial*; but the parties may stipulate for a continuance or a continuance may be granted on notice to the attorney of record and opportunity for him to be heard. *If, after such a request, the indictment or information is not brought to trial within that period, no court of this state shall any longer have jurisdiction thereof,* nor shall the untried indictment or information be of any further force or effect, *and the court shall dismiss it with prejudice.*" (Italics supplied.)

In the present case defendant was informed of the indictment on February 27, 1975—2 days after it was issued. On March 4, defendant requested disposition of the detainer resulting from the indictment. On Friday, March 7, Stillwater Prison authorities completed the certificate of defendant's inmate status and mailed it, postmarked March 7, to the Hennepin County clerk of court and the Hennepin County attorney. The clerk and the county attorney did not stamp the request and certificate with the date they were received.

On September 5, almost 6 months after the request and certificate were mailed, defendant appeared before the district court for arraignment. After refusing the aid of appointed counsel, defendant made an oral motion to dismiss the indictment for failure to comply with the act.[3] The trial

court scheduled a hearing on defendant's motion for September 9.

On September 9 defendant appeared *pro se* but was assisted by a public defender. The state moved for a continuance, stating that it was having difficulty locating out-of-state witnesses. The trial court did not specifically rule on either defendant's motion to dismiss or on the state's motion for a continuance, but the court did rule that the prosecution should be allowed to proceed. Defendant was then arraigned on the charges and a trial date of October 7 was set. The trial court also asked the public defender who was present to contact Thomas Drake, another public defender, because defendant expressed an interest in being represented by Drake in future proceedings.

On September 24, Drake renewed defendant's motion to dismiss the indictment for failure to comply with the act. On September 29, the court heard arguments on the motion. At the conclusion of arguments, the court granted the prosecution's renewed motion for a continuance, stating that it believed the prosecution was acting in good faith and that the delay had been caused by the unavailability of witnesses. The court reconfirmed the October 7 trial date, and the trial which resulted in defendant's conviction began on that date.

■ The right to a speedy trial is guaranteed by both the Federal and state constitutions[4] and is not suspended by imprisonment on other charges. *State v. Borough,* 287 Minn. 482, 178 N.W.2d 897 (1970). In interpreting the requirements of the Federal and state constitutions the United States Supreme Court and this court have looked to the facts of each case and have declined to lay down fixed time limits for pretrial delay.[5]

---

3. Defendant was under the mistaken impression that the 6-month period began to run when he was informed of the indictment on February 27.

4. See U.S.Const. Amend. VI, made applicable to the states by the Fourteenth Amendment, *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), and Minn.Const. art. 1, § 6.

5. In *Baker v. Wingo,* 407 U.S. 514, 521, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101, 112 (1972), the court observed: " * * * [T]he right to a speedy trial is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate. * * * If, for example, the State moves for a 60-day

■ It would appear that in adopting the act the legislature intended to go beyond constitutional minimum standards and provide (a) a specific mechanism for an inmate to assert his right to a speedy trial; (b) a general rule that inmates should be brought to trial within 6 months; and (c) a definite consequence for undue delay—dismissal of the charge irrespective of its gravity. While these elements of legislative intent must be given effect, the act also evinces a legislative intent to preserve an element of flexibility by making an exception to the 6-month rule where a continuance is granted for "good cause." Our interpretation of the act must give reasonable effect to this exception without licensing its use to nullify the general rule.

In applying the act to the facts of this case, the first question is when the 6-month period began to run. Defendant argues that since the clerk and county attorney did not stamp the request and certificate with the date they were received, the 6-month period must run from the date they were mailed by the prison authorities. This view was adopted in *Gardner v. State*, 29 Md. App. 314, 347 A.2d 881 (1975), but in our opinion it is unrealistic in this case and plainly contrary to the statutory provision that the 6-month period begins with *receipt* of the request and certificate. We take judicial notice that there is no same-day mail service between Stillwater and Minneapolis. Thus the request and certificate could not have been received on Friday, March 7, the day they were mailed.

■ Minnesota law provides that courts and county offices shall be closed on Saturday and Sunday. Minn.St. 373.052 and 484.07. Thus the first day the request and certificate could have been received is Monday, March 10, 1975, and we hold that the 6-month period began to run from that date. Therefore, it would expire on September 10, 1975, unless a continuance satisfying the act was granted.

In the present case the continuance was sought by the prosecution on September 9, within the 6-month period, but expressly granted by the trial court outside the period. None of the cases from other jurisdictions which have adopted the act addresses this specific situation. The act itself is silent as to whether the continuance must be sought or granted within the 6-month period.

■ Since the act does not impose a specific limitation on the time a continuance may be sought or granted, we likewise decline to do so. For us to impose a specific time limit on when continuances could be granted and for what length of time would be to destroy the limited flexibility which the legislature intended to preserve by including the continuance exception.[6] The act limits the continuance exception by the requirement that good cause be shown. Thus our inquiry into whether the continuance in this case comported with the act must also focus on whether good cause was shown.[7]

continuance, granting that continuance is not a violation of the right to speedy trial unless the circumstances of the case are such that further delay would endanger the values the right protects. It is impossible to do more than generalize about when those circumstances exist." Thus the court in *Wingo* enunciated a four-factor standard in which the length of the delay, the reasons for the delay, the defendant's assertion of his right, and the prejudice to the defendant were all weighed. We adopted this standard in *State v. Widell*, Minn., 258 N.W.2d 795 (1977), though our cases prior to *Wingo* also looked to these factors, particularly the presence or absence of prejudice to the defendant. See, *State ex rel. Knott v. Tahash*, 281 Minn. 305, 161 N.W.2d 617 (1968); *State v. Hartman*, 272 Minn. 58, 136 N.W.2d 543 (1965).

6. It should also be noted that by § 631.02 the legislature has authorized the trial court to postpone by continuance the time an indictment is brought to trial where "sufficient cause" is shown by either party. This places the grant of a continuance in an ordinary case within the sound discretion of the trial judge, whose decision will be reversed only for abuse of discretion. *State v. Fagerstrom*, 286 Minn. 295, 176 N.W.2d 261 (1970); *State v. Bell*, 275 Minn. 541, 146 N.W.2d 597 (1966).

7. On this point we find persuasive support in the New Jersey Supreme Court's decision in *State v. Lippolis*, 55 N.J. 354, 262 A.2d 203 (1970), which concerned the analogous continuance provision of the Interstate Agreement on Detainers. The court adopted the dissenting

The trial court ruled on September 29 that the prosecution had shown good cause. This ruling was based on an affidavit by a Minneapolis police officer who explained delays on the part of the San Francisco Police Department in locating crucial witnesses. We see no basis for disturbing the trial court's ruling that good cause was shown for granting the continuance. The additional delay in defendant's trial was minimal; it began approximately a month after the end of the 6-month period. And, more important, there is no indication, or even a claim, that defendant was prejudiced by the delay. Thus we hold that the continuance was proper, and the trial court was not required by the act to dismiss the indictment.

2. In the second issue raised, defendant argues that the indictment was duplicitous, contrary to Minn.St. 630.23(3), and should have been dismissed before trial. Section 630.23(3), provides: [8]

> "The defendant may demur to the indictment when it shall appear from the face thereof:
>
> *      *      *      *      *      *
>
> "(3) That more than one offense is charged in the indictment, *except in cases where it is allowed by statute.*" (Italics supplied.)

Defendant argues that the indictment violated § 630.23(3) because it stated offenses involving two victims. Prior to trial the court offered to delete the count relating to Miss Renna but defendant and his counsel declined, arguing that the entire indictment should be dismissed. Defendant renewed his objection at the close of the state's case, and the trial court withdrew from the jury the count relating to Miss Renna. Thus defendant was convicted only on the two counts pertaining to Miss Hattling.

The rule against duplicitous indictments is intended to prevent the defendant from being "embarrassed or confused in making his defense by the necessity of meeting several distinct accusations *founded on disconnected acts and requiring the production of evidence of a different nature.*" (Italics supplied.) *State v. Gopher Tire & Rubber Co.,* 146 Minn. 52, 57, 177 N.W. 937, 939 (1920). But where the several offenses charged were part of the same course of criminal conduct, the defendant is not "embarrassed or confused" in making his defense to the various counts. In fact, in such cases there are strong policy reasons for considering all offenses in a single prosecution. Section 630.23(3) leaves the door open for a single prosecution of such offenses by making an exception for "cases where it is allowed by statute." Minn.St. 609.035 specifically authorizes such a prosecution. It provides:

> " *   *   *   [I]f a person's conduct constitutes more than one offense under the laws of this state he may be punished for only one of such offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them. All such offenses may be included in one prosecution which shall be stated in separate counts."

The first sentence quoted above clearly limits its *punishment* for multiple offenses which are part of the same course of criminal conduct. But the second sentence of § 609.035 clearly allows such offenses to be joined in a *single prosecution* and thus is an exception to the rule against "duplicitous" indictments.[9] Therefore, the indictment was not defective because it contained counts relating to both Miss Renna and Miss Hattling,

opinion in the intermediate appellate court, reported at 107 N.J.Super. 137, 257 A.2d 705 (1969), and held that where good cause was shown the interstate agreement allowed a continuance to be sought and granted after the expiration of the 180-day (6-month) period.

8. This statute has been superseded by Rule 17.03, subd. 3, Rules of Criminal Procedure, but the prosecution of this case commenced before the rules became effective.

9. Defendant's reliance on *State ex rel. Stangvik v. Tahash,* 281 Minn. 353, 161 N.W.2d 667 (1968), and *State v. Prudhomme,* 303 Minn. 376, 228 N.W.2d 243 (1975), to avoid this conclusion is misplaced. Those cases concern the propriety of *multiple punishments* where multiple victims are involved and do not question the propriety of a single indictment listing several counts involving multiple victims.

and it was not error for the trial court to refuse to dismiss the indictment before trial.

 Similarly, we find no error in the trial court's instruction to the jury that it could consider the evidence relating to the robbery of Miss Renna in its deliberations on the counts relating to Miss Hattling which were before it.

 3. The third issue raised by defendant concerns the admission of testimony by the Sargent sisters recounting out-of-court declarations by Bailey. Specifically defendant challenges as inadmissible hearsay Rebecca Sargent's testimony that Bailey stated while crying, "He killed her. He killed her," referring to defendant.

We need not determine whether the testimony was admissible [10] because it was not objected to at trial. Defendant's only objection to the admission of hearsay evidence came in the initial portion of testimony by the state's first witness, Carmen Olson. This objection cannot be carried forward as a blanket objection to testimony by later witnesses. Objections to possibly inadmissible evidence must be made at the time such evidence is introduced. *Carpenter v. Mattison*, 300 Minn. 273, 219 N.W.2d 625 (1974); *State v. Pearson*, 153 Minn. 32, 189 N.W. 404 (1922). Where an objection is not made, hearsay evidence will be admitted and has probative force. *Gumphrey v. Gumphrey*, 262 Minn. 515, 115 N.W.2d 353 (1962); *Quick v. Benedictine Sisters Hospital Assn.*, 257 Minn. 470, 102 N.W.2d 36 (1960).

 4. The final issue is whether the evidence is insufficient as a matter of law to show that defendant acted with intent to cause death, which is required for conviction of second-degree murder. Minn.St. 609.19. Viewing the evidence, as we must, in the light most favorable to the verdict, we have no difficulty in sustaining the conviction. There was evidence that defendant armed himself with a knife having an 8-inch blade. More importantly, there was evidence that the single knife wound was not a slash, as if one were cutting a purse strap, but a deep incision into the heart. Finally, there was evidence of defendant's statement later that evening that "she * * wouldn't let go of her purse, so I stuck the knife in her side." Intent is usually not susceptible to direct proof, and from this evidence it was permissible for the jury to infer that defendant acted with intent to cause death.

Affirmed.

WAHL, J., took no part in the consideration or decision of this case.

---

10. We note, however, that the hearsay was probably admissible under the exception for hearsay statements by others which are "adopted" by the defendant to constitute admissions against penal interest. See, *State, Village of New Hope, v. Duplessie*, 304 Minn. 417, 231 N.W.2d 548 (1975).