STATE of Minnesota, Respondent,

v.

Ronald Vernon SCHNEIDER,
Appellant.

No. C3–86–40.

Supreme Court of Minnesota.

March 20, 1987.

Steven P. Russett, Asst. State Public Defender, Minneapolis, for appellant.

Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

YETKA, Justice.

The appellant-defendant, Ronald Schneider, appeals from the decision of a jury in Hennepin County District Court, first, finding him guilty of burglary, kidnapping and first-degree murder and then, in the second half of his bifurcated trial, rejecting his defense of insanity. We affirm the conviction and sentences imposed.

The events for which defendant faced trial began on February 13. On that day, defendant lost substantial sums in the stock market. This event, combined with previous stock market losses and with recent news that his girl friend was pregnant, left defendant in an angry and depressed state. After an evening spent alone, during which he broke two television sets he owned, defendant decided at about 2:00 a.m., February 14, to break into the offices of his dentist, Dr. Kraft, and his opthalmalogist, Dr. Hess. These offices are in a professional building located a couple of blocks from defendant's apartment. According to psychiatric testimony, defendant went to these offices because the offices of professionals like doctors or lawyers had an aura of power about them, and defendant wished to manipulate the medical instruments so as to gain power himself and compensate for his disappointments. Defendant took with him a pry bar, glass cutter and a gun. Defendant took the gun with him out of a general fear of other people.

The building in which Drs. Kraft and Hess worked is known as the Mark II Professional Building. The first floor is small, containing only a glassed-in entryway, an elevator, and a flight of stairs. The second and third floors are larger, extending over a parking lot and containing numerous offices.

Defendant went to the back entrance of the Mark II and cut a hole in the glass of the emergency exit door on the second floor of the building. After entering the building, defendant forced open the door to Dr. Kraft's office, played with the dental instruments and apparently arranged the lobby chairs in a circle. He then crossed the interior hallway to Dr. Hess's office. Defendant believed that Dr. Hess had previously cheated him out of $20 when he repaired his eyeglasses so defendant took $20 from the petty cash drawer. Defend-

ant returned to Dr. Kraft's office, but left shortly.

Meanwhile, Richard Ligda, the manager of an insurance company on the third floor of the building, arrived at his office about 1:00–1:30 a.m. to practice using a recently acquired computer. At approximately 2:00 a.m., Ligda left his office and walked downstairs to leave for home. While going by the second floor, he noticed that office doors were ajar and that the glass of the emergency exit door was broken. Ligda went back to his office and called the police, then left the building to meet them outside. Officers John Scanlon and Lowell Hughes arrived in separate police cars within 5 minutes. The three men re-entered the building and walked along the hallways, checking the offices and restrooms for intruders. Finding none, the men used the phone in Ligda's office to tell Dr. Luckow about the break-in. The three then left the building. Officer Scanlon drove off in his car to see if anyone was leaving the area. Officer Hughes left on foot to investigate the origins of fresh footprints in the snow.

After standing alone in the parking lot for a few minutes, Ligda took the elevator to his office, planning to call the landlord and then go home. As he exited the elevator on the third floor, Ligda was confronted by a man he later identified as defendant coming up the stairs between the second and third floors. Seeing Ligda, defendant stopped, pulled a gun from his fatigue jacket, and pointed it at him. Defendant asked, "Are you the one who called the cops?" Ligda denied doing so and started walking down the hall. Defendant followed Ligda and said, "Come on, you're going to be a hostage." Defendant made Ligda walk downstairs 3–4 feet in front of him. At some point, while walking, defendant said, "If you were the one who called the cops, I'm going to kill you." Just before exiting the building, defendant said, "They're out here waiting to blast away." The parking lot was empty except for a police car and Ligda's car parked side by side. Defendant told Ligda to get into the police car. Ligda balked so defendant asked if the other car was Ligda's. Ligda denied it so defendant said, "Come on, we're going." and motioned for Ligda to walk down the driveway. As they walked, Ligda put his hands in the air, hoping to tip off any police in the area that something was amiss. A car began approaching on the road leading to the building. Defendant told Ligda to put his hands down. The car, which was a police car, continued towards the two, then stopped. Defendant, who, at this moment, was no longer behind Ligda, but a few steps to the right, walked ahead of Ligda, pointed down the road and said, "He went that way. He went that way." Ligda took off to the left, hoping to get behind the car, and shouted, "That's him. That's him." As Ligda passed the front of the car, he saw defendant walk up to the window and stick his hand through it, then heard two gunshots. Ligda ran across the highway and hid in the woods. Defendant opened the door of the police car and tried to see the face of the man he shot. Defendant heard a siren go off so he closed the door and walked back to his apartment. Officer Scanlon had been shot twice and died from a bullet passing through his heart.

After he got back to his apartment, defendant spent the rest of that day alone. At some point, he shaved off his mustache. His girl friend came to defendant's apartment the next day, February 15. The two briefly discussed the shooting. Defendant said it happened very quickly, that he panicked and did not know why he shot the police officer. All defendant remembered of the shooting was feeling the recoil of the gun discharging twice. Defendant did remember ordering the hostage to put his hands down and telling the police officer that "[h]e went that way." He also remembered opening the door of the police car and pushing the policeman over so he could get into the car though he couldn't remember why. Defendant remembered seeing the policeman shaking and leaning over and noticed that he did not have his gun out of his holster. While defendant was with his girl friend, he cut up the hat he had worn at the shooting, as well as

another similar cap, and flushed the pieces down the toilet.

On September 15, the police arrested defendant in his apartment, acting on a tip from a friend of defendant.

After arrest, defendant was interviewed on behalf of the defense by two psychiatric experts, Drs. Zuelke and Philander. At trial, they recounted defendant's description of the shooting. According to defendant, as he approached the police car on the night of the shooting, he saw the car turn from white to black, appear to fill with liquid, and then turn into a giant white face surrounded by red hair. The face looked like that of his father, who had died in 1969. Defendant had not been invited to attend the funeral and had had doubts about the reality of his father's death. Defendant said he moved the body in the police car in an unsuccessful attempt to identify the body. Defendant said that, in the first few hours after the shooting, he wasn't sure what had happened. He watched the police activity at the sight of the killing and only gradually realized that he was the killer.

Defendant was originally charged with two counts of first-degree murder, felony murder and murder of a police officer in the course of duty, two counts of kidnapping, one count of first-degree burglary and one count of second-degree assault. In the first phase of his bifurcated trial, defendant was convicted of all counts. In the second, or sanity, phase of trial, the defense presented the opinions of Drs. Zuelke and Philander that defendant was legally insane at the moment of his act, *i.e.*, he was suffering from a mental defect such that he did not know the nature of his act or did not know the difference between right and wrong. The state presented its own witness on the issue, Dr. Malmquist. The state also subpoenaed the testimony of two other psychiatrists, Drs. Schwartz and McCafferty, who had originally interviewed defendant at the request of the defense, but had not been called by the defense. Finally, the state introduced lay testimony that defendant had acted normally before and after the shooting. The jury found that the defense had not carried its burden of proving insanity.

The issues raised on appeal are:

I. Was there sufficient evidence of intent to support defendant's convictions of first-degree burglary and first-degree murder?

II. Did the defense show, by a preponderance of the evidence, that defendant was legally insane at the time of the killing?

III. Was it error to allow the state to subpoena testimony from a defense-retained psychiatrist?

IV. Could the state elicit evidence from witnesses who had been hired by the defense, but not called to testify for defendant?

V. Should defendant have received consecutive sentences for his convictions?

When assessing whether a criminal conviction is supported by sufficient evidence, the court examines the evidence by viewing it in the light most favorable to the verdict and will assume that the jury disbelieved any testimony in conflict with the result it reached. *State v. Oevering*, 268 N.W.2d 68 (Minn.1978). The element of intent is not usually susceptible to direct proof and must, therefore, be proved by circumstantial evidence. *State v. Hamilton*, 268 N.W.2d 56, 63 (Minn.1978). A conviction based on circumstantial evidence will be sustained on appeal when the reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except guilt. *State v. Threinen*, 328 N.W.2d 154, 156 (Minn.1983).

A. *Burglary*

Minn.Stat. § 609.582, subd. 1 (1986) defines burglary as entering a building without consent and with intent to commit a crime. The defense argues that there was insufficient evidence that defendant broke into the professional building with an

accompanying intent to commit a crime inside.

The evidence available at the first phase of the trial shows that defendant broke in the outer door of a building, broke open two interior doors, and rummaged through two medical offices. Various items of small value, including stamps, a calculator, casting gold and some petty cash, were later reported missing by the occupants of the offices. Ligda testified that he saw defendant carrying some object under his arm when leaving the building that could have been a radio though he wasn't certain. A police search of the defendant's apartment did not reveal any of the missing items.

Even though there is no direct evidence that defendant stole all the items reported missing, the circumstantial evidence is strong that defendant must have been responsible for taking some of them. Defendant is even more clearly responsible for the petty vandalism of breaking open interior doors of the building and causing certain incidental damage while rummaging through the two offices.

The defense argues that appellant entered the building "solely to obtain a feeling a purpose and power thereby relieving him of overwhelming feelings of tension and anxiety." Even as phrased, such a motivation does not necessarily exclude a criminal purpose. Moreover, any argument that defendant merely wished to wander harmlessly through the offices of his dentist and opthalmalogist is belied by the actual damage and petty theft that occurred. The crimes that defendant intended may have been nebulous in his mind and petty in their magnitude; however, the intent was still criminal. The evidence that defendant's intentions were essentially harmless is mostly derived from psychiatric testimony presented in the second half of the trial and not applicable to the jury's determination of guilt. The circumstantial evidence was consistent with an intent to commit petty vandalism and inconsistent with a harmless intent.

## B. *First-Degree Murder*

Both forms of first-degree murder with which defendant is charged—felony murder and murder of a police officer in the course of public duties—require that defendant intended the death of his victim. The defense argues that there is insufficient evidence that defendant intended to kill Officer Scanlon to support a conviction of murder.

Richard Ligda testified that defendant walked up to the open window of the police car, stuck his hand in, and fired twice. Ligda also testified that defendant threatened to kill him as they walked downstairs and expressed concern that "they" were going to "blast away" when he left the building. According to his statements to his girl friend, defendant wasn't sure why he shot the policeman and didn't remember anything about the actual shooting except the recoils of the gun in his hand. Defendant did recall his action immediately before and after the shooting, including telling the policeman "He went that way." and opening the door to the car and seeing the policeman shaking. Defendant did not remember why he called out to the police or opened the door.

■ The jury is not required to believe that, because defendant could not later remember why he took certain actions, he did not intend those actions at the time. There is not even the requirement that defendant knew at the time why he shot the policeman, only that the killing was done intentionally. Whether defendant knew why he killed is a matter more relevant to the question of his sanity. The other evidence noted tends to show that defendant was thinking about killing immediately before he shot Officer Scanlon and that he did so deliberately, not accidentally.

Accordingly, we find that the jury had sufficient evidence of intent to convict defendant of burglary and first-degree murder.

■ In the second half of his trial, defendant raised the defense that the murder

was excused by reason of insanity. Minn. Stat. § 611.026 (1986) states that a person shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act the person was laboring under such a defect of reason, from [mental illness or mental deficiency] * * * as not to know the nature of the act, or that it was wrong." This statute is a codification of the *M'Naghten* rule first established in *M'Naghten's Case*, 8 Eng.Rep. 718 (1843). In Minnesota, the defendant must show, by a preponderance of the evidence, that he meets the *M'Naghten* standard. *State v. Malley*, 285 N.W.2d 469, 472 n. 3 (1979). Both expert and lay testimony is admissible. The factfinder is not bound by the expert testimony even where the only expert testimony available supports the defendant's assertion of insanity. *DeMars v. State*, 352 N.W.2d 13 (Minn.1984). However, if the factfinder does choose to ignore expert testimony, this decision must reasonably be based on available evidence. *See State v. Malley*, 285 N.W.2d 469, 474 (1979) (Yetka, J., dissenting); *cf. State v. Hoskins*, 292 Minn. 111, 193 N.W.2d 802 (1972) (jury could rely on intensive cross-examination and circumstances of crime in deciding to reject the conclusions of psychiatric experts).

Five psychiatric experts testified at trial. The two called by the defense, Drs. Zuehlke (a psychologist) and Philander (a psychiatrist), described defendant's psychiatric history, which included confinement to mental hospitals in the early 1970's, sporadic periods of hallucinations, and occasional arrests for minor crimes. They also described his perceptions at the moment of shooting: basically, that he was confronted by the huge face of his father when he approached the police car and that he didn't intend to shoot, but simply felt the gun go off in his hand. The two defense experts came to similar conclusions, namely, that defendant had a tendency to slip in and out of delusional states and that, at the time of

the shooting, he was in one of these states and unable to distinguish between right and wrong. They also agreed that this delusional period lasted only a few minutes and probably did not commence until after defendant yelled at the approaching police car "He went that way."[1]

The state called three experts to testify. Dr. Malmquist interviewed defendant by request of the state prosecutor. Defendant described to Dr. Malmquist a hallucination at the time of shooting that was consistent with the description given to Drs. Zuehlke and Philander (police car turning black, filling with liquid and becoming the distorted face of his father). Though Dr. Malmquist thought that defendant knew the nature of his acts at the time of the shooting, he did not think he had sufficient evidence to render an expert opinion as to whether defendant knew right from wrong when he shot. Specifically, Dr. Malmquist said:

The questions I addressed is [sic] in this [sic] terms, he knew there was a man in the car. Whether that man with the face, father's face was his father, never told me for sure, he knew there was a man there. Whether he in some ways did not know it was wrong I have nothing material to indicate that. Whoever was there, the man got shot and I don't have any pyschiatric material to shed light on that in terms that he would not have thought that act was wrong.

Later, under cross-examination, Dr. Malmquist said:

I guess I make the assumption that if a person doesn't present material to me to allow me to come to a conclusion he doesn't know that it was wrong, then there's no basis for me to express that opinion. It's an unwarranted conclusion in my mind. It's extending psychiatric expertise beyond where it should be.

Drs. McCafferty and Schwartz had interviewed defendant at defense counsel's re-

---

**1.** Both defense psychiatrists agreed that defendant did not meet the *M'Naghten* standard of insanity during those times when defendant was committing the burglary or kidnapping. Thus, defendant makes no argument that those convictions were excused by insanity.

quest. Dr. McCafferty thought that defendant knew the wrongfulness of his conduct, but did not have enough evidence to conclude whether defendant knew the nature of his act, mostly because defendant's reports of his thoughts at the time of the killing were evasive and incomplete. Dr. Schwartz could not come to a decision regarding whether defendant met the *M'Naghten* standard of sanity. He felt there was evidence pointing in both directions and would leave the decision open to the judgment of others.

There was also lay testimony offered by the state to show defendant's sanity at times proximate to the shooting. Terry Slattery, an old friend of defendant, testified that defendant had spent the day of February 12 in his company and had seemed in good humor. Officer Neil Neddermeyer, a detective who spoke with defendant immediately after arrest a day after the murder, said defendant understood why he had been arrested and what his rights were. Neddermeyer described defendant's conversational responses as inappropriate, but not bizarre, and did not otherwise elaborate.

Defendant's position is that, because two psychiatrists found the accused *M'Naghten* insane and three did not express an opinion, the preponderance of the evidence is in favor of the accused's insanity. However, this argument tends to oversimplify the psychiatric testimony.

Four out of the five experts who testified agreed that defendant understood the nature of his acts while he was shooting at the policeman. The fifth, Dr. McCafferty, would state no opinion. The main disagreement among these four experts is whether defendant knew that his act was wrong. The experts all accepted defendant's recollection, as consistently recounted in psychiatric interviews, that, in the few seconds before he shot the policeman, his target appeared to him as the giant distorted face of his father and that he could not remember actually shooting. Two experts, Drs. Zuehlke and Philander, were willing to conclude from this that defendant was unable to make moral distinctions. One expert, Dr. Malmquist, did not find sufficient evidence to determine defendant's capacity for moral judgment. One expert, Dr. Schwartz, came to a similar conclusion that the evidence was too conflicting to reach an expert opinion. If the jury accepted the opinions of these latter two experts, its conclusion must have been that medical or psychiatric expertise could not aid them in determining defendant's capacity to distinguish right from wrong in this case and that it must consider other forms of evidence to determine whether defendant met the *M'Naghten* standard. The opinion of Drs. Zuehlke and Philander that defendant did not know his actions were wrong would then simply be a different expert interpretation of the available medical evidence, an interpretation the jury could choose to ignore.

The most important lay testimony regarding defendant's sanity when he killed Officer Scanlon was defendant's own description of his thought processes, Richard Ligda's description of defendant's actions, and the physical evidence of defendant's behavior. Cumulatively, this evidence shows that defendant did, at times, act irrationally during the course of the burglary, kidnapping and shooting. For example, defendant arbitrarily rearranged the chairs of an office, asked his hostage to get into a police car, and tried to climb into a police car with his dead victim. Moreover, at the very moment of shooting, it seems clear that defendant was suffering some thought distortion. He told consistent stories of a hallucination, he couldn't tell his girl friend why he fired, and claimed not to remember much except the double recoil of his gun. Yet, defendant also often acted like any rational person who feared police capture for burglary. He took a hostage, ordered the hostage to lower his arms, and tried to misdirect the police. Moreover, he told his girl friend details of events very close in time to the actual shooting, such as noticing that the gun was still in Scanlon's holster and that the victim was shaking and leaning over. Defendant's history demonstrated that he had been delusional

and psychotic at other times in his life, but not that he was always in this state. In light of the evidence, the jury could reasonably conclude that whatever hallucinations defendant suffered were not sufficient to cloud his perception completely and that there was simply not enough evidence to show that defendant did not know right from wrong at the moment of shooting.

■ This court finds that the jury could have reasonably concluded that the defendant had not demonstrated he was legally insane when he killed Officer Scanlon.

Over objection, the state subpoenaed two psychiatrists, Drs. Schwartz and McCafferty, who had originally interviewed defendant at the request of defense counsel and had advised counsel on his presentation of an insanity defense. At trial, Drs. Schwartz and McCafferty gave their opinions as to defendant's mental condition and admitted that, despite being initially retained by defense counsel, they had not been asked to testify at trial. Defendant argues that forcing these psychiatrists to testify denied him constitutional guarantees of fair trial and effective assistance of counsel.

If the court accepts defendant's argument, it must distinguish or reconsider the recent case of *State v. Dodis*, 314 N.W.2d 233 (Minn.1982). In *Dodis*, the court upheld a prosecutorial subpoena of a psychiatrist. As in the present case, the psychiatrist had been retained by defense counsel to examine defendant, but had not been called by the defense to testify at trial. The court found this procedure to be consistent with the attorney-client privilege and constitutional rights to effective counsel. *Dodis* was based on our conclusion that the results of a psychiatric examination are objective medical evidence. Where the issue is not the accused's guilt or innocence, but his sanity or insanity at the time of his guilty act, then such objective evidence should be freely available to all parties.

Defendant claims that two factors distinguish *Dodis* from the present case. First, in *Dodis*, the defense counsel was specifically authorized by court order to retain a psychiatrist. In the present case, counsel hired Drs. Schwartz and McCafferty on his own initiative. However, nothing in *Dodis* indicates that the court's authorization to retain a psychiatrist gave the prosecutors any greater right to subpoena the testimony of the psychiatrist then would otherwise apply. The emphasis of *Dodis* is on the fact that the psychiatrist was retained by the defense, not that he was authorized by the judge.

The second factual distinction relied on by the defense centers on the differing relationship between expert and counsel apparent in the two cases. In *Dodis*, the psychiatrist involved simply examined the accused twice though, presumably, the psychiatrist also reported back to the defense counsel. In contrast, evidence was presented in this case that Drs. Schwartz and McCafferty were given confidential information by defense counsel to aid them in analyzing defendant's sanity, that they advised counsel on how to present his *M'Naghten* defense and that they suggested strategies for cross-examination of opposing experts.

The court did not allow the prosecutor to inquire into the details of the conversations between defense psychiatrists and defense counsel. As noted before, Drs. Schwartz and McCafferty testified only as to their expert opinion as to defendant's medical condition and about the fact that they had been hired by the defense, but not used. Defendant still argues that the intimate involvement of the psychiatrists in aiding defense counsel significantly distinguishes this case from *Dodis*.

■ First, defendant notes that Drs. Schwartz and McCafferty based their opinions in part on confidential information supplied them by defense counsel and argues that this breach of confidentiality would make the use of the medical opinions at trial a violation of the client's attorney-client privilege. However, an attorney, within the limits of professional propriety, has been held to have the implied authority

to divulge confidential information to third persons when necessary. *Sprader v. Mueller*, 265 Minn. 111, 121 N.W.2d 176 (1963). An independent expert is not an employee of defense counsel. *See Matter of Welfare of T.D.S.*, 289 N.W.2d 137, 141 (Minn.1980). Therefore, these experts can be treated like any other third party. Yet, it was clearly proper for defense counsel to reveal facts of his client's history to psychiatrists from whom he was obtaining advice.

■ Defendant also argues that the information he provided to Drs. Schwartz and McCafferty during examinations is protected by the attorney-client privilege. He was advised by these psychiatrists, and presumably his attorney, that the communications were confidential. Even if that advice were mistaken, defendant believed it in good faith and cannot be said to have knowingly waived his privilege not to reveal this confidential information.

■ However, we find an implied waiver. Defendant was required to submit to an examination by a court-appointed psychiatrist if he wished to put his sanity into issue. Minn.R.Crim.P. 20.02. Thus, some of the issues discussed with defense psychiatrists could not be kept confidential. Moreover, even though Drs. Schwartz and McCafferty assured defendant that their conversations would be confidential, defendant must have known the psychiatrists would reveal some details if they testified in defendant's favor at trial, as defense counsel hoped. Only communications that are meant to stay in confidence are protected by the privilege. *Wenner v. Gulf Oil Corp.*, 264 N.W.2d 374 (Minn.1978). Only if the psychiatrists had examined defendant solely for the stated purpose of advising defense counsel and not with the thought of testifying at trial would it be clear that the privilege was not waived.

Defendant claims the advisory role played by the defense-retained psychiatrist in this case also poses a greater threat to the Sixth Amendment right to effective assistance of counsel than was true in *Dodis*. The form of the threat posed in the two cases is said to be the same. By waiting for defense counsel to hire psychiatrists and then subpoenaing those who give opinions not helpful to the defense, the state discourages defense counsel from using psychiatrists or, worse, encourages the defense to resort only to psychiatrists who can be counted on to support the criminally accused. Either way, the defense is unable to rely on expert, impartial medical opinion. The defense goes on to argue that the loss to the defense in the present case is even more grievous than in *Dodis* because the psychiatrists were used not just to examine the accused and to present evidence at trial, but also to aid the accused in preparing an insanity defense. Numerous courts have recognized the importance of expert psychiatric advice to a lawyer planning an insanity defense. Most recently, the Supreme Court said in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985):

> [T]he assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, both through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers.

*Id.* at 80, 105 S.Ct. at 1095. *Cf. Loe v. United States*, 545 F.Supp. 662 (E.D.Va. 1982) (defense counsel's failure to seek independent expert's appraisal of client's psychiatric condition in reliance on government experts' evaluation constituted denial of minimum level of representation guaranteed by the Sixth Amendment).

⸱ As defendant argues, defense counsel are greatly hampered if they are pressured into limiting their use of psychiatric consultation and advice. However, it is not clear

that the advisory roles of Drs. Schwartz and McCafferty really distinguish this case from *Dodis*. In *Dodis*, the court contemplated that psychiatrists would be giving, at least, some advice to the counsel who retained them. Moreover, attempting to distinguish between psychiatrists who merely examine an accused and those who examine and give advice on trial strategy would have the practical effect of simply overruling *Dodis*. Any lawyer could probably present some evidence that his expert gave him advice.

We find insufficient differences between this case and *Dodis* to justify distinguishing the previous case, and we decline to overrule *Dodis*. We believe its logic is sound and should be followed.

In response to questions by the prosecutor, Drs. Schwartz and McCafferty told the jury that they had originally been hired by defense counsel to examine defendant, but that counsel had chosen not to call them to testify. The defense argues that this conduct violated defendant's right to a fair trial.

This court has held that it was improper for a prosecutor to comment on a defendant's failure to call an alibi witness. *State v. Caron*, 300 Minn. 123, 218 N.W.2d 197 (1974). We noted that such comments might erroneously suggest to the jury that defendant had the burden of proof or that the defendant did not call the witnesses because he knew their testimony would be unfavorable. In this case, defendant does have the burden of proof on the issue of insanity. Moreover, there is no doubt about the nature of the testimony of his witnesses. However, defendant suggests that there remains the implication that he was trying to hide the truth, especially unfair given that *Dodis* made the opinions of all expert witnesses equally available to all sides.

Other courts have held that comment on an accused's failure to call a psychiatrist was inherently prejudicial, *State v. Pratt*, 284 Md. 516, 522–23, 398 A.2d 421, 425–26 (1979), or ultimately harmful to the credibility of those psychiatrists who do testify for the defense. *People v. Pate*, 108 Mich. App. 802, 310 N.W.2d 883 (1981). *See also United States ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1053 (E.D.N.Y.1976) (prejudice from evidence that expert originally employed by defendant can be met by excluding information about nexus). The question, however, is whether the prosecution's questioning in this case seems to be unnecessarily prejudicial.

The fact that the prosecutor here did not just comment on the defense's failure to call its expert witnesses, but produced them himself did allow the defense to comment on their testimony and attempt to mitigate any prejudice caused by their appearance. Moreover, the second stage of a trial involving the defense of insanity differs from the first phase which is concerned with proving whether defendant committed the act itself. There, the state has the burden of proof beyond a reasonable doubt. In the second stage, however, the defendant has the burden of proof by a preponderance of evidence to prove the defense of insanity. The second phase is more akin to a civil proceedings. By this time, it has already been established that defendant has committed the act, which is the basis for the crime alleged. The crime has been solved, the perpetrator of the act is known. The only issue is whether defendant is not guilty by reason of insanity. Thus, there is a great incentive that all the relevant facts should be brought out.

However, it is usually not relevant in determining the defendant's insanity whether a psychologist examined the accused at the behest of the defense. Experts are not the paid harlots of either side in a criminal case and should not be portrayed in such a light. Normally, any relevance to the disclosure that one or the other side hired a particular expert would be outweighed by the risk of unfair prejudice and, therefore, exclusion would be warranted under Minn.R.Evid. 403. Yet, there can be no flat prohibition of such disclosure because the identity of an expert may, at times, be relevant. For example, to challenge the expert's credibility, the

defense may seek to attack the expert's qualifications: "The purpose of adversary advocacy at times is defeated when cross-examination as proposed here unrealistically is confined or restricted to so narrow a limitation as to reduce the effectiveness of the truth-seeking process." *Pate,* 108 Mich.App. at 811, 310 N.W.2d at 888 (Mich. Ct.App.1981) (Cynar, J., concurring).

The trial judge is normally in the best position to determine whether evidence should be excluded, and those decisions will be reversed only when the exercise of that discretion has been abused. In this case, the prosecutor pointed out in his opening statement that he would be calling two witnesses originally contacted by defendant and, in his closing argument, commented that Drs. McCafferty and Schwartz were first contacted by defense counsel and suggested that they were not helpful enough to the defense, forcing it to find other experts before trial. The trial court's actions were prompted in part by these questions asked by the prosecutor of Dr. McCafferty:

DR. CHARLES McCAFFERTY—DIRECT

Q. Was the purpose of that examination to determine whether he qualified under the M'Naughton [sic] rule as mentally ill?

A. Yes, it was.

Q. How did it come about that you were asked to examine him?

A. I was asked to see him by the defense and again this is an issue that before I actually give the results of my test of my examination I want to make it clear to the Court that you know I appear as a witness for the prosecution reluctantly.

Q. I understand that.

A. Primarily I was subpoenaed because I was asked to see him for the defense and I have some ethical ambiguities about testifying for the prosecution. It's as if I find myself retroactively being in—in a sense presenting myself as a sheep.

THE COURT: Excuse me, Doctor. I've allowed you to continue although not in response to any question because, as a courtesy to you, I think you're entitled to make those statements. But the jury should be advised that this Court made a legal determination that you're being called in the capacity in which you are presently being called under subpoena by the State is appropriate as a matter of law. And accordingly, the responsibility for your proceeding to testify, it should be made clear, was this Court's legal determination.

And I have no problem in noting on the record that you took the position you're presently taking beforehand. And if you do testify now it's with the clear understanding it's because this Court has determined legally that it's appropriate for you to be called in this way. You are here under subpoena compelled to testify? [sic]

THE WITNESS: That's correct, Your Honor, and I respect the Court and I am here testifying although I have ethical problems with it primarily because I respect the law and the determination that you made this morning.

THE COURT: Thank you.

Instead of allowing the prosecution to make further comments on the circumstances of Dr. McCafferty's hiring, it would have been better policy for the court to have advised the jury that the opinions of all psychiatrists who have examined a criminally accused are freely available to both parties and that no prejudicial inference can or should be drawn from the identity of the party requesting the psychiatrist's services. However, we do not find that the trial court abused its discretion by not doing so.

■ The error of the prosecutor's conduct was, in any case, harmless. Though the prosecutor's remarks may have hurt the credibility of the defense psychiatrists, the jury could have chosen to ignore all the expert testimony presented and rely simply on the lay testimony. Determining insanity is a difficult function, but one left solely

to the jury and not dependent on the opinion of any particular expert.

 According to Minnesota Sentencing Guidelines, consecutive sentences may be given only when "the offender is convicted of multiple current felony convictions for crimes against different persons." Minnesota Sentencing Guidelines II.F. (1986). The burglary, the kidnapping and the murder involved in this case were all separate crimes against different persons.[2] While the sentences do appear harsh when made consecutive, the sentencing was clearly within the discretion of the trial judge. *See State v. Williams*, 337 N.W.2d 387 (Minn.1983).

Thus, we affirm the trial court.

WAHL, J., dissents.

WAHL, Justice, dissenting in part.

The evidence in the guilt phase of the trial was sufficient to prove beyond a reasonable doubt that the defendant committed the acts of burglary and murder in the first degree. I cannot agree, however, that the conduct of the prosecutor in the insanity phase of the trial—eliciting evidence from two of the expert witnesses that they had originally been hired by defense counsel to examine the defendant but that counsel had chosen not to call them to testify, in addition to the following conduct—was harmless error. Not only did the prosecutor elicit that evidence, he pointed out in his opening statement that he would be calling two witnesses originally contacted by the defendant and emphasized in his closing argument that Dr. McCafferty and Dr. Schwartz were first contacted by defense counsel but gave unsatisfactory results causing the defense to employ Dr. Philander and Dr. Zuehlke at the last moment. The case involves both the admission of unfairly prejudicial evidence and comment on that evidence.

Comment on an accused's failure to call a psychiatrist has been held by other courts to be inherently prejudicial, *State v. Pratt*, 284 Md. 516, 522–23, 398 A.2d 421, 425–26 (1979), or ultimately harmful to the credibility of those psychiatrists who do testify for the defense. *People v. Pate*, 108 Mich. App. 802, 310 N.W.2d 883 (1981).

This court in *State v. Caron*, 300 Minn. 123, 218 N.W.2d 197 (1974), held that it was improper for the prosecutor to comment on a defendant's failure to call an alibi witness. We tested the effect of that prosecutorial impropriety on the trial of the case by the standard used for non-constitutional error, *i.e.*, whether the error substantially influenced the jury to convict. *Id.* at 127–28, 218 N.W.2d at 200. Applying that test to the case before us, it is unreasonable and unrealistic to conclude that the jury weighed the testimony of Dr. Philander and Dr. Zuehlke on the merits after being emphatically advised by the prosecution that the defense had first retained Dr. McCafferty and Dr. Schwartz, who also testified, but did not call them as witnesses because their opinions were not favorable to the defense and caused the employment of new defense psychiatrists at the last moment. It is more likely that the jury was substantially influenced to discount the credibility of the defense psychiatrists regarding the defendant's insanity and to give greater credibility and weight to the testimony of Dr. McCafferty, Dr. Schwartz, and the lay witnesses. The conduct of the prosecutor under the facts and circumstances of this case was inherently prejudicial. The rulings of the trial court to the contrary were in error. The judgment should be reversed and the case remanded for a new trial on the defense of insanity.

---

**2.** The fact that the assault that made the burglary of the first degree was committed against the same person, Richard Ligda, who was kidnapped, is not relevant inasmuch as the true victim of the burglary itself must be identified as the owner of the Mark II Office Building.