STATE of Minnesota, Respondent,

v.

Mitchell BLANCHARD, Appellant.

No. 81–154.

Supreme Court of Minnesota.

Feb. 5, 1982.

C. Paul Jones, Public Defender, and Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Gary Hansen and Barbara D. Gill, Sp. Asst. Attys. Gen., St. Paul, John E. Pearson, County Atty., Detroit Lakes, for respondent.

PETERSON, Justice.

Defendant Mitchell Blanchard was indicted for first-degree murder in the multiple stabbing death of Sharon Hill and was found guilty by a district court jury of second-degree murder. Defendant appeals from judgment of conviction contending (1) that the admission of testimony of a previously hypnotized witness constituted reversible error, (2) that the admission of other-crimes evidence was reversible error, and (3) that the admission of evidence of the victim's fear of defendant was reversible error. We affirm.

On Sunday, April 30, 1978, at about 8:30 a. m., a body was found lying in a ditch outside Detroit Lakes, Minnesota. An autopsy was performed, and the death was determined to be caused by the combination of 24 stab wounds and loss of blood. The time of death was set at 4 a. m. CDT (3 a. m. CST).[1] At 3:30 p. m., the body was identified as that of Sharon Hill. The events leading up to defendant's conviction for the murder of Sharon Hill may be summarized as follows:

In March 1978, Sharon Hill, age 22, lived with her son Gary, age 1½, in an upstairs apartment in Detroit Lakes. Hill worked as a nurse's aide at Emanuel Nursing Home.

In mid-March, Sharon Hill met defendant, age 18, and Brian Smith, age 16, and immediately invited them to her apartment. They stayed all night. Defendant slept with Hill in her bedroom, and Smith slept on the couch. Defendant and Smith subsequently began to visit Hill at her apartment several times every day.

Hill and defendant had a stormy relationship. Neighbors often heard the two yelling back and forth in Hill's apartment. One morning Hill came crying to her neighbor Lena Wothe's apartment. Her lip was smashed and bleeding. She told Wothe that defendant had slapped her. She also said, "I don't care if they kill me but I don't want them to hurt my little boy." Another time, Hill was upset and started crying at Emanuel Nursing Home. She showed a co-worker bruises on her arm and neck and told her the bruises had come from defendant slapping her.

Defendant also abused Hill's child, Gary. He burned Gary with a cigarette and matches. Once he blew pepper in Gary's eyes.

The relationship between Hill and defendant became even more stormy in the weeks immediately preceding Hill's death. About 2 weeks before her death, Hill's other neighbor, Roberta Schoenberger, was awakened at 2 a. m. by shouting outside. She looked out her window and saw defendant standing in the street, alternately cursing Hill and pleading with her to let him in. At one point he yelled, "I won't hurt you and Gary."

---

1. "CDT" refers to Central Daylight Time. "CST" refers to Central Standard Time. On April 30, 1978, the time changed from standard to daylight time.

About 1 week before her death, Hill met Tom Sheridan, a stranger to her, around midnight, and the two drove around in Hill's car. Sheridan saw defendant and Smith and asked Hill to stop the car. Sheridan approached the two, asked for money they owed Hill and him, and warned defendant to leave Hill and her baby alone. Again, about 1 week before her death, defendant showed up at Emanuel Nursing Home. He shoved Hill and attempted to grab her car keys. After defendant left, Hill looked shakey, nervous, and scared. At about the same time, Hill took her son Gary to live with her parents.

On Friday night, April 28, Holly Kertscher, age 14, saw defendant in a car near the Pizza Factory in Detroit Lakes. He called her over to the car and asked her if she wanted to go drinking with him. Kertscher refused but asked where he was going. Defendant replied that he was going to Sharon's "[t]o pay her back" for whatever she had done to him.

On Saturday, April 29, Hill worked the 3–11 p. m. shift with Jayne Tokach. They finished work at 11, changed clothes, and drove in Tokach's car to a wedding dance at Spruce Grove. They arrived at the dance at 11:30 and stayed for 2 hours. After the dance, Tokach drove Hill directly back to the Emanuel parking lot, where Hill had left her car. Hill went into her car at about 2 a. m. Hill mentioned that she might stop on the way home for cigarettes. She smoked Merit 100s and had run out of cigarettes earlier that night.

Between 1:30 and 2 a. m., a woman and three men were seen at Warehouse Foods. The woman bought a package of Merit 100s cigarettes. An unopened pack of Merit 100s was later found in Hill's purse. One of the men had a bandage on his left hand. Defendant had a bandage on his left hand at that time. A Detroit Lakes patrolman first noticed Hill's car at Warehouse Foods at 2 a. m. and then saw it 4–5 other times until he went off duty at 6 a. m. The car did not appear to have been moved during that time.

The same Saturday, defendant and Smith went over to Steve Nybo's in the late afternoon and drank beer until it got dark. They bought more beer and went driving around in Nybo's truck. At around midnight, they visited Jody Block, Nybo's girlfriend, who was babysitting. The three men watched television, drank beer, and finally left between 1:30 and 2 a. m. Smith, who was "pretty drunk," went out first and fell asleep in the truck.

Brian Smith, whose memory was "refreshed" through hypnosis, testified at trial that defendant woke him up later that night and asked him to help move a body. Smith was in the backseat of Sharon Hill's car near an abandoned farmhouse 5 miles outside of Detroit Lakes. Smith got out, went to the back of the car, and saw a body. Smith said, "you killed her," and defendant laughed. Frightened, Smith ran home. Defendant called Smith between 9 and 10 a. m. later that day (Sunday, April 30) and told him that Sharon Hill was dead and that she had been stabbed. Smith's aunt, Patricia Roy, verified that Smith received a call from defendant at this time and that afterwards Smith said, "Well, Sharon Hill is dead." Significantly, Sharon Hill's body was not discovered until 8:30 that morning and was not identified by the police until 3:30 that afternoon.

Defendant's actions after the Hill homicide are highly incriminating. They include the following:

On Monday, May 1, he told an acquaintance that Sharon Hill "was a bitch and got what she deserved."

On May 3, he called Holly Kertscher and warned her that she had "better not tell anything we had talked [about]" on Friday, April 28, near the Pizza Factory. After he learned that Kertscher had informed the police of this conversation, he called her again and said that he was going to pay her back "[b]y doing what he did to Sharon."

Shortly after Hill's death, another acquaintance overheard defendant say to Brian Smith that "they had the story down pat, that they could never get caught."

At a party on May 14, defendant threatened a woman, saying she was "going to end up like Sharon Hill" and admitted that he had killed her.

In June 1978, defendant, accompanied by Smith, told a young girl that he got back at Sharon Hill for something she had done. He also agreed with Brian Smith's detailed version of the actual stabbing.

On August 27, 1978, defendant admitted to still another acquaintance that he had killed Sharon Hill and asserted that there was no evidence against him.

Finally, in July 1979, a woman asked defendant and others to leave an apartment building. Defendant responded, "Don't give me no shit or you'll be just like Sharon."

Defendant was later indicted for first-degree murder and convicted of second-degree murder. He now appeals from this conviction.

1. State witness Brian Smith was hypnotized before the trial. Defendant contends that the admission of Smith's hypnotically influenced testimony constitutes reversible error.

This court has twice addressed the issue of whether hypnotically influenced testimony is admissible in criminal proceedings. In *State v. Mack*, 292 N.W.2d 764 (Minn.1980),

after considering the testimony of five expert witnesses, we held that testimony of a "previously hypnotized witness concerning the subject matter adduced at the pretrial hypnotic interview may not be admitted in a criminal proceeding." *Id.* at 772. In *State v. Koehler*, 312 N.W.2d 108 (Minn. 1981), we adhered to *Mack* and reversed a first-degree murder conviction because of the erroneous admission of incriminating hypnotically influenced testimony.

We note with interest that a number of jurisdictions have recently found hypnotically influenced testimony admissible either for all purposes or under certain conditions.[2] Several commentators have also recently urged that such evidence be admitted under certain conditions.[3] We further note that the hypnosis in this case does not indicate the potential for suggestion apparent in our previous cases.[4] Nevertheless, we adhere to our holding in *Mack* and *Koehler* that a hypnotically influenced witness must not be allowed to testify in a criminal proceeding concerning matters he or she "remembers" under hypnosis. We are, of course, willing to consider future developments in this area, but we at this time adhere to our determination that hypnotically influenced recollections are inadmissible under the standards announced in *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).

2. See, e.g., *Pavone v. State*, 402 N.E.2d 976 (Ind.1980); *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981); *State v. Greer*, 609 S.W.2d 423 (Mo. Ct.App.1980), vacated on other grounds, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981); *People v. Lucas*, 107 Misc.2d 231, 435 N.Y.S.2d 461 (Sup.Ct.1980); *State v. Glebock*, 616 S.W.2d 897 (Tenn.Cr.App.1981). *But see State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981); *People v. Gonzales*, 108 Mich.App. 145, 310 N.W.2d 306 (1981).

3. See, e.g., Comment, *Hypnosis—Its Role and Current Admissibility in the Criminal Law*, 17 Willamette L.Rev. 665 (1981); Note, *The Probative Value of Testimony from the Hypnotically Refreshed Recollection*, 14 Akron L.Rev. 609 (1981); Note, *Safeguards Against Suggestiveness: A Means for Admissibility of Hypno-Induced Testimony*, 38 Wash. and Lee L.Rev. 197 (1981). *But see* Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Calif.L.Rev. 313 (1980).

4. In *Mack* the hypnotist lacked formal education and scientific understanding of the human memory and the potential of suggestion in hypnosis. The hypnotist was hired by the police, and the police were present during the hypnotic session. In *Koehler*, the hypnotist was a police officer, actively involved in the investigation, who had taken a hypnosis course only 2 weeks prior to the hypnotic session. In contrast, the hypnosis in this case was performed by Dr. Ralph McKinney, a clinical psychologist. Dr. McKinney uses hypnosis in his daily practice and has hypnotized 700–800 people over the last 8 years. Brian Smith's attorney, rather than the police, referred Smith to Dr. McKinney. Smith and Dr. McKinney were the only persons present during the hypnotic session. The hypnotic session was tape-recorded. *Cf. State v. Mack*, 292 N.W.2d at 771–72, n.14 (hypnosis safeguards, recommended by Dr. Martin T. Orne, a leading expert in hypnosis, to ensure freedom from suggestion, noted but not adopted by this court).

We further hold that the erroneous admission of Smith's hypnotically influenced recollections is not reversible error. In contrast to the testimony of the state witness in *Koehler*, Smith's hypnotically refreshed testimony was not highly prejudicial. Smith was a key witness for the state, but there was also extremely damaging testimony from other witnesses about six different occasions in which defendant admitted directly or by implication that he killed Hill. Furthermore, Smith's pre-hypnotic memory contained devastating evidence against defendant.

At trial, Smith's pre-hypnotic recollection was reported by Dr. McKinney:

"We were at Steve's girlfriends's place. Her name is Jody Block. We left at 1:30 or 2 o'clock in the morning. I passed out. Mitch woke me. Wanted me to move a body. I freaked out." I asked him, "Where are you?" "At an abandoned farm house." He described himself as being inside a vehicle. "What is the next thing that you remember?" "Mitch called me the next day. He told me, 'Sharon is dead.'" I asked him what happened. Then Brian said, "I don't know."

\*    \*    \*    \*    \*    \*

He said, "Mitch did it, I think. I was passed out."

Under hypnosis, Smith added the following details: Smith was in the backseat of Sharon Hill's car when defendant woke him and asked him to move a body. He got out of the car and went to the back of it. He saw a body behind Hill's car and heard gurgling noises coming from it. Smith said, "you killed her," and defendant laughed. At that point Smith ran to his aunt's home with defendant chasing him part of the way. He could not get into his aunt's home so he went to defendant's home. Defendant was not there. Smith went back to his aunt's and this time got in. Defendant called Smith at 9:30 that morning and told him that Sharon was dead.

Smith's pre-hypnotic memory was very similar to his post-hypnotic memory. Smith "remembered" more details as a result of

the hypnosis, but the crucial information remained unchanged: Smith was awakened by defendant in the vicinity where the victim's body was found at the approximate time the murder occurred, and defendant asked him to help move a body. Under the circumstances of this case, where the evidence of guilt is clear without resort to the erroneously admitted hypnotically refreshed recollection of witness Smith, we hold that its admission was not reversible error.

2(a). Over objection, Brian Smith testified that defendant threw a lit match on Gary Hill's leg and that he burned Gary with a cigarette. Smith also testified that he saw defendant blow pepper in Gary's eyes. Defendant contends that the admission of this evidence was reversible error.

Defendant's contention is without merit. Evidence pertaining to the relationship between a defendant and the homicide victim is ordinarily admissible in criminal prosecutions, regardless of its reference to another crime. *State v. Salas*, 306 N.W.2d 832 (Minn.1981); *State v. Diamond*, 308 Minn. 444, 241 N.W.2d 95 (1976) (*per curiam*). The fact that the evidence concerns defendant's behavior toward the victim's son rather than the victim herself does not affect its admissibility under these circumstances. Evidence of a defendant's assaultive conduct toward a third party related to or a close friend of the victim is generally admissible both to show "a highly strained relationship" between the defendant and the victim and to establish a motive and premeditated intent on the part of the defendant to kill the victim. *State v. Johnson*, 256 N.W.2d 280, 286–87 (Minn.1977). For this reason, evidence that defendant abused the victim's 1½-year-old son is as relevant as evidence that defendant abused the victim.

(b). Bureau of Criminal Apprehension Agent Gary Nelson testified on direct examination that defendant indicated to Holly Kertscher that he did not want her "narking" on him about the fact that he "dealed some dope." Defendant asserts that the trial court's failure to grant his motion for

a mistrial on the ground of the erroneous admission of this other-crimes evidence was reversible error.

■ Defendant's claim is without merit. Although the prosecutor does have "some responsibility for preparing his witnesses in such a way that they will not blurt out anything that might be inadmissible and prejudicial," *State v. Carlson*, 264 N.W.2d 639, 641 (Minn.1978), the introduction of the other-crimes evidence at issue does not warrant reversal. The record disclosed that many of the persons involved in the circumstances of this case drank excessively, acted violently, and used drugs. In addition, given the substantial evidence of defendant's abusive behavior toward Sharon Hill before her death and his suspicious actions after, it is difficult to imagine that this relatively inconsequential other-crimes evidence was prejudicial. This conclusion is buttressed by the fact that the trial court provided a general cautionary instruction on other-crimes evidence at the close of the trial.

For these reasons, the erroneous introduction of other-crimes evidence does not warrant reversal.

3. Lena Wothe testified that Sharon Hill came crying to her apartment one morning about a week before her death. Hill, whose lip was smashed and bleeding, said that defendant had slapped her across the room. Over objection, Wothe testified that Hill also said, "I don't care if they kill me but I don't want them to hurt my little boy." Defendant argues it was reversible error to

admit the hearsay evidence [5] as a statement of then existing state of mind pursuant to Minn.R.Evid. 803(3).[6]

In *State v. Ulvinen*, 313 N.W.2d 425 (Minn.1981), we considered whether hearsay statements concerning a homicide victim's fear of a defendant are admissible. We said that because the statements in the case were extremely prejudicial and the victim's state of mind was not at issue, the admission of the statements would normally require a new trial. Because the evidence was insufficient to support the verdict, the case was reversed without remanding for a new trial.

*Ulvinen* is in accord with a growing number of courts [7] which have held that hearsay evidence concerning a homicide victim's fear of the defendant is admissible only under the following conditions:

a. The victim's state of mind must be a relevant issue. The victim's state of mind is generally relevant only where the defendant raises the defense of accident, suicide, or self-defense.

b. The trial court must weigh the probative value of the evidence against the risk of unfair prejudice to the defendant.

c. A proper limiting instruction must be given to the jury.

These conditions are necessary because of "the risk that the jury will consider the victim's statements of fear as a true indication of a defendant's intentions or actions," *Campbell v. United States*, 391 A.2d 283, 287 (D.C.App.1978).

5. The statement was introduced merely as circumstantial evidence of Hill's state of mind. Since the statement was not offered for the truth of the matter asserted, it is not technically hearsay. Nevertheless, because its "probative value depends on the credibility of the declarant," the statement "should be carefully scrutinized as if [it was] hearsay." 11 P. Thompson, Minnesota Practice, Evidence § 803.03 at 358 (1979).

6. Minn.R.Evid. 803(3) provides that the following is not excluded by the hearsay rule, even though the declarant is available as a witness: A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health),

but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

7. *See, e.g., United States v. Brown*, 490 F.2d 758 (D.C.Cir.1973); *People v. Ireland*, 70 Cal.2d 522, 450 P.2d 580, 75 Cal.Rptr. 188 (1969); *Campbell v. United States*, 391 A.2d 283 (D.C. App.1978); *State v. Goodrich*, 97 Idaho 472, 546 P.2d 1180 (1976); *People v. White*, 401 Mich. 482, 257 N.W.2d 912 (1977); *State v. Singh*, 586 S.W.2d 410 (Mo.Ct.App.1979); *Shults v. State*, 616 P.2d 388 (Nev.1980); *State v. Wauneka*, 560 P.2d 1377 (Utah 1977); *State v. Parr*, 93 Wash.2d 95, 606 P.2d 263 (1980).

We adhere to *Ulvinen* and adopt the rule that hearsay evidence concerning a homicide victim's fear of the defendant is admissible only when these three conditions are satisfied. We therefore conclude that the admission of Lena Wothe's testimony was error. That conclusion, however, does not end our inquiry. "A defendant claiming error in the trial court's reception of evidence has the burden of showing both the error and the prejudice resulting from the error. * * * A reversal is warranted only when the error substantially influences the jury to convict." *State v. Loebach*, 310 N.W.2d 58, 64 (Minn.1981). Defendant has not met his heavy burden on these facts. There was overwhelming evidence that defendant repeatedly abused Sharon Hill and her child and that she was afraid of him. The state of mind evidence was merely cumulative. Moreover, there was overwhelming evidence of defendant's guilt. The error in this instance simply did not substantially influence the jury to convict defendant.

Affirmed.

KELLEY, J., took no part in the consideration or decision of this case.