STATE of Minnesota, Respondent,

v.

George Earl BLASUS, Appellant.

No. CX–87–2006.

Supreme Court of Minnesota.

Sept. 15, 1989.

C. Paul Jones, State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, and Thomas J. Keyes, Beltrami Co. Atty., Bemidji, for respondent.

WAHL, Justice.

George Earl Blasus appeals from a judgment convicting him of first degree murder of his wife, and attempted first degree murder and second degree assault on two relatives, after a jury rejected his defense of mental illness. Appellant alleges several errors in the mental illness defense portion of the trial and also challenges the post-conviction denial of a new trial on the basis of newly discovered evidence. Because the prosecutor's questioning of defense expert witnesses in the mental illness portion of the trial as to their prior participation in specific, notorious and highly publicized murder cases may have prejudiced this otherwise close, factual case, we reverse and remand for a new trial on the mental illness defense only.

Appellant's convictions arise from a single shooting incident which occurred February 1, 1987, when appellant was 69 years old. Prior to the incidents leading to the shooting, appellant led an exemplary life. He was in active military service during World War II, and had a career as an electrician and refrigeration mechanic in the Bemidji area. Appellant married his wife, Hazel, in 1965, and they had one son, Randy. In 1981, appellant retired from his position as Director of Physical Plant at Bemidji State University. He had no prior criminal record and was well-liked by his neighbors.

Although appellant suffered some health problems, he was able to keep his diabetes and ulcers under control, and had a successful coronary bypass operation in 1981. In 1986, appellant began to experience short spells of blindness. Tests revealed his carotid arteries were constricted by cholesterol deposits, which were breaking off and lodging against the optic nerve, causing temporary blindness. On September 17, 1986, appellant underwent surgery at the Fargo Veterans Administration Hospital to remove the blockage from his right carotid artery. During the surgery, some cholesterol broke off and lodged in appellant's brain, causing a stroke and damag-

ing the left prefrontal and left parietal lobes of the brain.

Appellant remained in the hospital for two months for physical therapy. When he returned home around Thanksgiving, he still suffered a loss of motor control; neighbors and family noticed a marked personality change. Approximately two months after appellant's return home, Hazel Blasus decided to separate and end their 22–year marriage. Over the New Year's weekend of 1986–87, she left her home without informing appellant and moved in with her niece and her niece's husband, Charlotte and Clyde Palmer.

Between the time Hazel moved out and the date of the shooting, appellant was observed at the Fargo VA hospital. The doctors noted that appellant's blood sugar level was unusually high and that he seemed very depressed. Dr. Gary Falk, a VA psychiatrist, prescribed an antidepressant medication, Nortriptyline.

On January 29, 1987, appellant called a neighbor, threatening suicide, but did not go through with the act. The following Sunday, February 1, 1987, appellant called the Palmer house and asked to speak with his wife. Charlene Palmer told him Hazel had gone to town with Clyde, although she had not, because Charlene did not want appellant to come to the house while Clyde was away. Appellant drove to the Palmer house, parked near-by, and waited for Clyde to return. Clyde, his daughter Wendy, and Charlene's mother and brother, Agnes and Calvin Gudgeon, noticed appellant's car as they returned. Appellant followed them home and asked to speak with Hazel. She agreed, and appellant entered the house.

Appellant spoke to Hazel in the living room and was angry that he had been told she wasn't home. Charlene Palmer told him she had said Hazel wasn't there and he should not blame Hazel. Appellant raised his voice and argued with Charlene, telling her to stay out of his family's business. Clyde Palmer then told appellant he would have to calm down or he would have to leave.

Appellant walked toward the door, then pulled a Luger handgun and shot Clyde Palmer in the arm. Appellant shot twice at Hazel Blasus, striking her in the abdomen and leg, then shot Clyde again, hitting him twice in the hips. One shot hit Calvin Gudgeon in the arm. As appellant attempted to reload, Charlene, Wendy and Calvin wrestled the gun away from him.

Appellant was taken into custody. Hazel Blasus was taken to the hospital. Surgery to stop bleeding from her liver was unsuccessful and she died from loss of blood.

Appellant pled not guilty and not guilty by reason of mental illness, and a bifurcated trial was held. In the first phase of the trial appellant testified in his own defense that he went to the Palmer's house intending to say goodbye to Hazel and then kill himself. The jury found appellant guilty of first degree murder, attempted first degree murder and second degree assault. Appellant does not challenge these findings.

In the second portion of the trial, appellant introduced evidence of his stroke and the extent of the resulting damage. Testimony was elicited as to appellant's personality changes after his stroke, and CT scans taken before and after the stroke were shown and explained to the jury. Dr. James Stephans and Dr. Kenneth Perkins, a psychiatrist and a psychologist, testified that appellant suffered from "Organic Mood Affect Disorder–Depressive," caused by the stroke. In their opinion, this depression was coupled with several incidents of extreme emotional response, called a "catastrophic reaction," which led appellant to be unable to understand the nature of his acts when he shot his wife, or that his acts were wrong. Dr. Stephans admitted in cross-examination that "catastrophic reaction" is no longer listed as a recognized disorder in Am.Psych.Assn. *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. 1980) (Revised), the standard diagnostic manual for his profession. Over objection, the prosecutor cross-examined Dr. Stephans about his participation, with Dr. Perkins, for the defense in a number of notorious Minnesota murder cases. Appel-

lant also sought to introduce hearsay statements related by Hazel Blasus to the lawyer who was representing her in the dissolution action but the trial court ruled the evidence inadmissible. The prosecution presented testimony by the psychiatric team which evaluated appellant at St. Peter Security Hospital prior to trial to determine his competency to stand trial as well as evaluate the appropriateness of a mental illness defense. Dr. Manfred Meier concluded there was no connection between the organic damage caused by the stroke and appellant's behavior on February 1, 1987, although he had not seen the CT scans before arriving at his conclusion.

The appellant requested a jury instruction that a mental illness defense may be proven notwithstanding the temporary nature of the mental illness. The request was denied and the jury returned a verdict rejecting the mental illness defense on all three counts. Appellant was sentenced to concurrent sentences of life, 70 months and 21 months.

On appeal, appellant alleges three errors occurred in the second portion of the trial: the prosecutor improperly cross-examined defense psychiatric experts for bias and improperly argued that bias in closing arguments; the trial court should not have excluded hearsay testimony the victim related to her attorney; and the trial court erroneously denied the requested jury instruction. While appeal to this court was pending, appellant was placed in Oak Park Heights Correctional Facility and later transferred to Moose Lake State Hospital in March 1988.

After his transfer, appellant was examined by Dr. Harold Vinnes, a psychologist, who performed an intake psychological assessment of the appellant. On the basis of additional tests which were not performed prior to trial, Dr. Vinnes concluded appellant had suffered more brain damage as a result of the stroke than Dr. Meier found, which affected appellant's ability to monitor his behavior. Consequently, Dr. Vinnes concluded that, at the time of the shooting, appellant was unable to judge whether his

behavior was right or wrong, or even to consider the issue.

Based on this information, appellant stayed the appeal pending before this court and, through a post-conviction proceeding, sought a new trial. The trial court considered Dr. Vinnes' deposition, responsive letter affidavits by Drs. Meier and Farnsworth of St. Peter Security Hospital, and Dr. Vinnes' reply letter affidavit. The court denied appellant's motion for post-conviction relief on the basis that additional tests by a different expert did not constitute new evidence sufficient to award a new trial. Appellant reinstated his appeal, adding a challenge to the denial of post-conviction relief.

The decisive and most troublesome issue in this case is whether the prosecutor improperly and prejudicially cross-examined defense psychiatric experts. During the mental illness portion of the bifurcated trial, appellant's counsel, in establishing the expert's qualifications, questioned Dr. James Stephans about his involvement in forensic psychiatric testimony in criminal cases. Dr. Stephans calculated that over approximately 14 years, he had evaluated 100 to 150 patients in criminal matters and testified in approximately 30 cases. Dr. Stephans also indicated that he had testified for the state in licensing and ethics matters before the Minnesota Board of Medical Examiners, as well as in civil matters. This line of questioning is standard foundation testimony and was in no way unusual or unexpected.

On cross-examination, the prosecutor attempted to demonstrate that Dr. Stephans was not a disinterested witness, but had a defense bias. The prosecutor established that Dr. Stephans had not testified against a defendant in a criminal case since 1983 or 1984. The prosecutor then asked if Dr. Stephans had "testified for the defense in the Jurgen's case?" The defense objection was overruled on the basis that the defense had opened the door by inquiring into various areas where the witness had testified. The prosecutor then asked about the *Ming Sen Shiue, Hoffman, Mikulanec* and *Rairdon* cases and established that,

with the exception of the *Hoffman* case, Dr. Stephans and Dr. Perkins had worked together in all these "recent major criminal cases." [1]

Appellant's motion for mistrial based on this line of questioning was denied. The prosecutor began similar questioning of Dr. Kenneth Perkins, but the trial court sustained an objection since appellant's counsel had not had "as significant an interrogation" of that witness along that line of questioning. During closing argument, the state argued the defense experts "make their living testifying for the defense" in comparison to the state's witnesses who often appeared in court for defense, as well as for the state. The prosecutor also referred to the *Jurgens* case, stating, "You heard Dr. Stephans testify that he's testified in a number of criminal cases, cases which you probably recognize; the *Jurgens* case, for example." Defense counsel's immediate objection was overruled.

Appellant argues this line of questioning was irrelevant to the issues of the case and was highly prejudicial. Admitting that bias is a legitimate issue to explore on cross-examination, appellant claims the prosecutor's questioning did not address the issue of bias but simply placed appellant in the same category as the defendants in these brutal murder cases.

The state claims the questioning was proper to correct the impression left by the direct examination that the experts were disinterested as between defense and state positions. In support, the state cites *State v. Hjerstrom*, 287 N.W.2d 625 (Minn.1979), where a prosecutor was allowed to elicit testimony from police that they had tried to question the defendant to get a complete statement as to what he had been doing that night, but the defendant had asked for an attorney and would give no information to the police. Although due process guarantees prohibit prosecutors from using a defendant's post-arrest silence for impeachment purposes, *Hjerstrom* held the prosecution's questioning allowable since defense counsel had cross-examined the arresting officer to create an impression the police were uninterested in obtaining defendant's version of events. 287 N.W.2d at 628.

In assessing the propriety of the prosecutor's cross-examination, we are keenly aware of the need to preserve counsel's ability to question adverse witnesses. The truth-seeking function of the courts is best served when counsel is allowed to seek and reveal hidden prejudice, bias, or other factors which may color a witness's testimony and affect its reliability. In the civil context, where the need for certainty is less, an appellate court may be less inclined to intrude on the trial court's discretion in weighing prejudicial effect of evidence against its probative value.

By its very nature, however, the criminal context is different. Attorneys who prosecute criminal cases are charged with responsibilities to the court, to the constitution, and to the defendant not present in civil cases. "The duty of the prosecutor is to seek justice, not merely to convict." ABA Standards Relating to the Prosecution Function, Standard 1.1(c); *See also*, National District Attorneys Association, *National Prosecution Standards*, Standard 176 and commentary p. 248–249 (1977) These additional responsibilities limit the scope of proper conduct of prosecutors to a

---

1. *State v. Jurgens,* 424 N.W.2d 546 (Minn.App. 1988) rev. denied (Minn., July 6, 1988) (two year old boy beaten by adoptive mother after a long period of extreme abuse); *State v. Shiue,* 326 N.W.2d 648 (Minn.1982) (defendant kidnapped former teacher and bludgeoned to death a six year old boy who witnessed the crime); *State v. Mikulanec,* Hennepin County D.C. File No. 69142, (defendant killed the fiance of her former boyfriend after stabbing her 97 times and was acquitted on a mental illness defense); (For brief factual outline *see also In re Mikulanec,* 356 N.W.2d 683 (Minn.1984) (defendant attempted to marry while at St. Peter Security Hospital)); *State v. Rairdon,* Ottertail County D.C. File No. 85–3953, App.Ct. File No. C5–86–959, appeal dismissed on motion of defendant, July 9, 1986, (defendant created community uproar in small northwestern Minnesota town by reporting to authorities that his daughter had been abducted while walking home from school when in fact he had killed her after she resisted his sexual advances); *State v. Hoffman,* 328 N.W.2d 709 (Minn.1982) (defendant killed his wife and dismembered her body).

narrower field than is available to their civil law counterparts.

In the instant case, any impression that Dr. Stephans testified equally often for the prosecution as for the defense had already been corrected before the prosecutor launched into the objectionable questions. Dr. Stephans admitted on cross-examination that he had not appeared on behalf of the state since 1983 or 1984. The prosecutor further established that, in the five years before 1983, Dr. Stephans had testified approximately one-third of the time for the prosecution and nearly two-thirds of the time for the defense. The latitude granted in *Hjerstrom* is not appropriate, since in this case the prosecutor was able to counter the impression created by the defense with quantitative, non-prejudicial evidence. Only after the quantitative testimony was admitted did the prosecutor pursue whether Dr. Stephans had testified in specific notorious cases. At best, such questioning was cumulative. As already indicated, any defense bias had already been disclosed. Even the state, in its brief before this court, does not argue that the testimony regarding specific cases had any unique evidentiary value beyond demonstrating defense bias.

Were this evidence merely cumulative, we would be reluctant to find its admission to be error. The evidence in question, however, was highly prejudicial. The murders referred to were gruesome and reprehensible, and the prosecution intended the jury to mentally link appellant with the frightening violence of these other cases, as is evident by the remarks in closing argument. Accordingly, the evidence should have been excluded as more prejudicial than probative under Minn.R.Evid. 403, and its admission was error.

■ This evidence may have been prejudicial, but will not warrant reversal if the error was harmless. Whether the error was harmless depends on whether there is any reasonable doubt the result would have been different if the evidence had not been admitted. *See Hjerstrom,* 287 N.W.2d at 628. If the jury here could have reached its verdict based on the other evidence of mental illness presented, the court will find harmless error. *c.f. State v. Schneider,* 402 N.W.2d 779, 789 (Minn.1987). In *Schneider,* the prosecutor subpoenaed doctors who had examined the defendant for a *M'Naghton* defense but were not called to testify by the defense. The doctors testified only to their expert opinions as to the defendant's medical condition and about the fact that they were hired but not called to testify. The prosecutor suggested in closing argument that these witnesses were not called by the defense because they were not helpful enough, forcing the defense to find new experts before trial. This court found the prosecutor's conduct to be harmless error, concluding:

> Though the prosecutor's remarks may have hurt the credibility of the defense psychiatrists, the jury could have chosen to ignore all the expert testimony presented and rely simply on the lay testimony. Determining insanity is a difficult function, but one left solely to the jury and not dependent on the opinion of any particular expert.

402 N.W.2d at 789–90.

The non-medical testimony presented in this case centered on the changes in appellant's personality after the stroke. Randy Blasus, appellant's 21 year-old son, testified that after the stroke appellant was more easily frustrated, no longer had a positive attitude, and tended to sit around self-absorbed. Randy also indicated that appellant's emotions became extreme, swinging quickly from one emotion to another, often "out of the blue." Randy moved out of appellant's house in early January 1987, after an incident when appellant became frustrated at his inability to install a deadbolt lock and destroyed his vintage radio collection, smashing the dials, faces and components with a hammer.

A neighbor, Nellie Withoff, testified that appellant was frustrated by his limitations after the stroke, on occasion crying in front of her. Another neighbor, Rangvold (Red) Marken, testified appellant was very emotional, often crying, and was suicidal as well. Appellant's sister-in-law Agnes Gud-

geon testified that appellant had not recognized her on the day of the shooting.

■ Absent any expert medical testimony, it is a close question of fact whether appellant's personality changes indicated mental illness which prevented him from understanding the nature of his acts. Where error may have prejudiced a close factual case, this court will order a new trial, even if the evidence is otherwise sufficient to support the verdict. *See State v. Underwood,* 281 N.W.2d 337 (Minn.1979). We hold, therefore, that the prosecutor's questioning of defense expert witnesses as to their prior participation in specific, notorious and highly publicized murder cases was improper, and may have been prejudicial in this close factual case, warranting a new trial on the mental illness defense.

■ Having thus disposed of the case, we need not reach the other issues raised on appeal. We do so, however, in order to clarify procedures on remand. We address first whether the trial court erroneously excluded hearsay testimony the victim allegedly related to her attorney, and conclude the evidence was properly excluded.

In establishing the mental illness defense, appellant sought to introduce testimony from Steven Fuller, the attorney representing Hazel Blasus in her dissolution action. Mr. Fuller was expected to testify as to some bizarre behaviors exhibited by appellant which Mrs. Blasus had described to him. The state objected on the grounds of hearsay and attorney-client privilege. The court held an *in camera* interview with Mr. Fuller without a court reporter present, then excluded the evidence. The court indicated it did not reach the question of privilege, but decided there was insufficient indicia of reliability to admit the evidence as required by Minn.R.Evid. 804(b)(5). The court opined that since Hazel Blasus was involved in a divorce with underlying animosity, she had a motive to exaggerate or distort the truth. The court further concluded the evidence to be offered would be cumulative and available from other sources, including from appellant himself, who had already testified.

Appellant argues the evidence was necessary, since some personality changes were observable only in the context of the marital relationship. The argument is made that hearsay statements of victims regarding their fear of the defendant are admissible to prove guilt, and should also be allowed to prove a mental illness defense. Finally, appellant argues the statements are not covered by attorney-client privilege, since they were made in the presence of a third party, Clyde Palmer, and were not intended to remain confidential.

Appellant does not offer this court any argument that Mrs. Blasus' communications to her attorney had any particular indicia of reliability, though at trial counsel did argue that Mrs. Blasus was unlikely to lie since she had never before consulted an attorney, and the truth of her statements were corroborated "by the fact that she left [the attorney's office] and told other people the same things." We agree with the trial court that these hearsay statements were not admissible. Statements which are made under oath and are subject to cross-examination may bear sufficient indicia of reliability to justify their admission under Rule 804(b)(5), but unsworn *ex parte* statements made during police questioning are traditionally considered inherently untrustworthy. *State v. Hansen,* 312 N.W.2d 96, 102–03 (Minn.1981). On the facts before us, we do not conclude that Hazel Blasus' statements made to her attorney in furtherance of legal action beneficial to her are any more trustworthy.

Appellant does offer *State v. Langley,* 354 N.W.2d 389 (Minn.1984) and *State v. Blanchard,* 315 N.W.2d 427 (Minn.1982), where hearsay statements of a homicide victim regarding fear of a defendant were admitted, but appellant does not explain how these cases are analogous to the hearsay in question. *Blanchard* established three conditions which must be met before such hearsay is admissible: the victim's state of mind must be relevant and is generally relevant only where the defendant raises a defense of accident, suicide, or self-defense; the trial court must weigh the probative value of the evidence against the possibility of unfair prejudice; and a

limiting instruction must be given. *Blanchard,* 315 N.W.2d at 432. None of these conditions is met in this case. Appellant's argument that the evidence was only observable by Mrs. Blasus in the context of the marital relationship ignores the fact that appellant himself could observe that behavior, and in fact did testify, during the first phase of the trial, to post-stroke sexual dysfunction, including his difficulty in obtaining an erection.

We, therefore, hold that the trial court properly excluded hearsay statements related by the victim to her attorney where there were no indicia of reliability to justify admitting the testimony as an exception to the hearsay rule, and the evidence could have been obtained from another witness. Accordingly, we do not decide whether the proffered testimony is covered by attorney-client privilege.

Appellant also alleges the trial court improperly denied a jury instruction he requested, pursuant to *State v. Larson,* 281 N.W.2d 481, 486–87 (Minn.1979), that a mental illness may be proven despite the temporary nature of that illness in a particular case. The trial court denied defendant's request as well as the state's request for an instruction on the presumption of responsibility for a voluntary act. Instead, the trial court gave Crimjig 6.02 and 6.03, which included the following language:

> Under the Statutes of Minnesota a person is not criminally liable for acts when, at the time of committing the acts he did not know the nature of his acts or he did not know that they were wrong because of a defect of reason caused by a mental illness or mental deficiency.

10 Minnesota Practice. Jury Instruction Guides (2d ed. 1985).

■ A party is entitled to a jury instruction on that party's theory of the case if there is evidence to support it, but the court need not give the requested instruction if the substance of the request is contained in the court's charge. *State v. Daniels,* 361 N.W.2d 819, 831–32 (Minn.1985); *State v. Ruud,* 259 N.W.2d 567, 578 (Minn. 1977).

In this case, the trial court refused the requested instruction, stating:

> Likewise, I think the instruction is quite clear that what the jury is asked to find is that at the time of the act he didn't know what he was doing or didn't understand it was wrong * * * *
>
> The jury has got the opportunity if they find he was in that state even for 30 seconds while the trigger is being pulled, that's it, they're perfectly entitled to return not guilty by reason of mental illness.

Appellant argues the instruction actually given is too vague to constitute the instruction as requested, since the court and not counsel should be telling the jury what the law is and here the jury was given the distinct impression that temporary mental illness would not establish a valid mental illness defense. Appellant also claims that refusal to give the requested jury instruction was not harmless because its omission gave credence to the prosecutor's denigration of the defense experts.

■ The refusal to give a requested jury instruction lies within the discretion of the trial court and no error results if no abuse of discretion is shown. *Daniels,* 361 N.W.2d at 831. In *Daniels,* a trial court refusal to give a requested instruction was found to be not an abuse of discretion and not prejudicial where both counsel argued the issue in closing argument. *Id.* at 832. In this case, we hold there was no error in refusing defendant's requested jury instruction where the court did give an instruction that mental illness is to be evaluated at the time of the act, and defense counsel argued for that standard in closing argument.

■ Finally, appellant sought post-conviction relief in the form of a new trial based on the discovery of allegedly new evidence. The petitioner seeking such relief has the burden of establishing, by a fair preponderance of the evidence, facts which warrant reopening a case. Minn. Stat. § 590.04, subd. 3 (1988). The decision to grant a new trial lies in the discretion of the trial court and will not be disturbed

unless there is an abuse of discretion. *State v. Wofford,* 262 Minn. 112, 115, 114 N.W.2d 267, 269 (1962). A new trial may be granted where the newly discovered evidence could not have been discovered through due diligence before trial; was not within petitioner's or his counsel's knowledge before trial; is not cumulative, impeaching, or doubtful; and would have probably produced a different or more favorable result. *Berry v. State,* 364 N.W.2d 795, 796 (Minn.1985).

The petition for a new trial is based upon the results of neuropsychological tests which were performed by Dr. Vinnes at Moose Lake Regional Treatment Center after appellant's incarceration there. Appellant claims he could not have discovered this evidence before trial because counsel did all that he could by retaining independent defense experts. While admitting that the experts who were retained could have performed the additional tests Dr. Vinnes performed, appellant claims it would have been superfluous for them to do so merely to confirm the conclusion they had already reached. Because neither appellant nor his counsel knew of Dr. Vinnes and his tests before trial, appellant claims to meet the second condition of the test for a new trial. Appellant does not claim that the test itself did not exist before trial, rather that Dr. Vinnes' testing of appellant did not exist before trial. Counsel characterized the offer of new evidence as "[H]ad he been available and had the tests been done on Mr. Blasus, that [Dr. Vinnes] would testify that in his opinion the State's doctors did not go far enough in doing the testing of Mr. Blasus, and, therefore, they were not able to render an accurate opinion as to his insanity under the M'Naughton Rule."

Dr. Vinnes' evidence is merely a different opinion from a different expert, based on a different test which measures many of the same capacities as the other tests which were administered before trial. Generally expert testimony does not constitute newly discovered evidence justifying a new trial. *Tuseth v. Thoreson, Inc.,* 287 N.W.2d 633, 635 (Minn.1979). Nine medical experts gave testimony at appellant's trial; if the discovery of a tenth expert is new evidence warranting a new trial, no verdict would ever be final. We therefore hold the trial court properly refused to grant a new trial on the basis of additional tests which had not been administered prior to trial. Since a new trial is being granted for other reasons, however, such evidence would be admissible on retrial.

Reversed in part and remanded for a new trial on the mental illness defense.

POPOVICH, C.J., and KELLEY and COYNE, dissent.

KELLEY, Justice (dissenting):

The decisive issue in this tragic case is whether the trial court erred when, over objection, it permitted the prosecutor to cross-examine two professionals who were called by the defendant as expert witnesses in support of his mental illness defense.[1] Because I believe the trial court's ruling was well within the perimeter of the discretion the law affords to trial judges in this area, I respectfully dissent both from the majority's conclusion that the prosecutor's cross-examination was improper or prejudicial, and from its remand for a new trial of the mental illness defense.

---

1. The mental illness defense was asserted in the second part of the trial which had been bifurcated as provided in Minn.R.Crim.P. 20.02, subd. 6(2). The mental illness defense is based on Minn.Stat. § 611.026 (1988), which, in essence, restates the M'Naghten "right-wrong" test and reads:

611.026. **Criminal responsibility of mentally ill or deficient.**

No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense; but the person shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act the person was laboring under such a defect of reason, from one of these causes, as not to know the nature of the act, or that it was wrong.

*See M'Naghten's Case,* 10 Cl. & F. 200, 8 Eng. Rep. 718 (H.L.1843) (opinion of Lord Chief Justice Tindal).

A witness qualified as an expert by knowledge, skill, experience, training, or education is permitted to testify and give professional opinions on crucial issues in criminal as well as in civil cases if the testimony will aid the jury in resolving the issue. Minn.R.Evid. 702. Concomitant with qualifying the witness as an expert, the party calling the witness frequently tries to augment his or her credibility by, in addition, eliciting from the witness "facts" designed to create an impression of disinterest and impartiality. In the instant case appellant's counsel followed that general practice. On direct examination he educed from Dr. Stephans that he had evaluated several scores of persons in criminal matters, had testified in a number of criminal cases, and had been retained by the state to render services in unrelated civil matters. The result of this line of questioning was to clothe Dr. Stephans with an aura of impartiality. It suggested that he was a detached, disinterested, scientific professional without any proclivity to favor an accused in a criminal case who seeks to escape retribution by advancing a mental illness defense. I do not suggest that by so doing counsel did anything wrong or even unusual. Perhaps, in fact, Dr. Stephans possessed those characteristics when he assumed the witness stand. Nevertheless, the prosecutor had the right to attempt to place that alleged impartiality in proper perspective, by cross-examination which revealed that Dr. Stephan and Dr. Perkins, a psychologist who also testified, had worked together "on recent major criminal cases," had always testified for the defense in criminal cases in recent years, and, further, had testified, in particular, in the notorious criminal cases referred to in footnote 1 of the majority opinion. The ruling of the trial judge in denying the objection of appellant's counsel to the latter line of cross-examination and the trial court's subsequent denial of a mistrial motion raise the issues that are before us on this appeal.

The law has long recognized the propriety of a litigant's attempt to elicit facts through cross-examination justifying an inference of partiality or bias of the witness. *See, e.g., McCormick on Evidence*, ch. 5, § 40 (E. Cleary 3d ed. 1984). The majority acknowledges the utility of the rule which permits a wide latitude of cross-examination designed to uncover information to aid the finder of fact in assessing the extent of any bias the witness may have as bearing on credibility. The majority acknowledges that courts therefore place few restraints upon the scope of permissible cross-examination for that purpose. However, it seems to me that the majority would confine that otherwise salutory and generally unlimited right to cross-examination for bias or partiality to civil litigation, but in criminal cases would unduly circumscribe its scope by reference to precatory language in the ABA Standards exhorting prosecutors to "seek justice." Few would quarrel with that amorphous aphorism. Nonetheless its recitation, in my view, provides very little objective guidance to defining the limits of prosecutorial conduct in cross-examining for credibility.[2]

In my view the prosecutor's duty is fulfilled when the prosecutor has, consistent with established rules of law, offered to present all relevant evidence bearing on culpability, or the lack thereof, to aid the jury in resolving the case, including information relative to the credibility of witnesses. The law wisely places in the trial judge the discretion to delineate the boundaries of the inquiry, and it is for the trial judge to determine whether "unfair prejudice" will result from the inquiry. The individual judge has some latitude in drawing the line beyond which cross-examination may not go in light of the circumstances inherent in the "setting" of the particular trial. Even so, that discretion itself is limited by the precept that undue restriction of cross-examination impinges upon a substantial right and by the law's safeguard that trials

2. As intriguing as a peregrination through the centuries to examine the reflections of philosophers from before the time of Aristotle to modern times on the meaning of the word "justice" might be, it would, of course, be inappropriate here. In passing, however, it might not be inappropriate to note that, like beauty, "justice" is often perceived from the standpoint of the beholder.

should be fair. *See, e.g., State v. Elijah,* 206 Minn. 619, 625, 289 N.W. 575, 579 (1940). We should not ignore the fact that the law is concerned that in a criminal trial the state, as well as the accused, not be deprived of a fair trial. *See* Minn.R. Crim.P. 1.02.[3]

Since the earliest days of statehood, this court has consistently held in both criminal and civil cases that bias, state of mind, and inclinations of witnesses, upon whose testimony in part the issue is to be determined, are not collateral or immaterial matters; that cross-examination on the issue of bias or interest is a matter of right; and that its denial or undue circumscription is prejudicial error. *See, e.g., State v. Dee,* 14 Minn. 35, 37 (Gil. 27, 30) (1869); *Alward v. Oakes,* 63 Minn. 190, 193, 65 N.W. 270, 271 (1895); *Elijah,* 206 Minn. at 625, 289 N.W. at 579. In the latter case we quoted with approval the observation of the Supreme Court of the United States in *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931),

> Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. * * * To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial.

*Elijah,* 206 Minn. at 625, 289 N.W. at 579.

Rule 402, Minn.R.Evid., which provides that relevant evidence is admissible at trial, is identical to its federal counterpart, Fed. R.Evid. 402. Under either, credibility evidence is almost always relevant. "Proof of

bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984). Although Rule 403, Minn.R.Evid., excludes relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice," nonetheless, the *Alford* rule implicitly circumscribes the discretion of trial courts to limit cross-examination for bias. *Elijah,* 206 Minn. at 625, 289 N.W. at 579.

By cross-examination of these two witnesses, particularly Dr. Stephans, the prosecutor was attempting to dispel the aura of impartiality that lingered after defense counsel had completed his direct examination. His purpose, obviously, was to attempt to elicit facts which might cause the jury to assess the objectivity of those two witnesses with some scepticism. Its probative value was very high. *See, e.g., State v. Larson,* 369 N.W.2d 561, 565 (Minn.App. 1985), *rev'd on other grounds,* 389 N.W.2d 872 (Minn.1986). That these experts for several years prior to this trial had testified with respect to mental illness defenses only on behalf of the accused in criminal trials, and had done so in certain notorious cases, were relevant facts for jury consideration in assessing weight to be given to the testimony of the experts in this case. A different trial judge might have exercised his or her discretion to circumscribe the scope of the prosecutor's cross-examination. Had that occurred, I would be inclined to affirm that decision. However, because this evidentiary ruling fell within the realm of the judge's judicial discretion, I am unwilling to hold as a matter of law that his refusal to curtail the prosecutor's

---

**3.** Other legal rules condone or authorize the introduction of relevant evidence against the accused although it can be argued that its admission creates a danger of unfair prejudice far outweighing its probative value. For example, if an accused testifies, he may be impeached by his prior felony record. Minn.R.Evid. 609(a). This is permitted, though undoubtedly often highly prejudicial to an accused charged with a specific current crime, so that the jury will have

the "whole picture," and not a one-sided view of the accused. Likewise, under certain circumstances and for certain purposes, the law permits the state to introduce evidence of other crimes—evidence which may be extremely prejudicial—so that the state, as well as the accused, gets a fair trial. *See, e.g.,* Minn.R.Evid. 404(b); *State v. Spreigl,* 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965); *State v. Billstrom,* 276 Minn. 174, 176–77, 149 N.W.2d 281, 283 (1967).

cross-examination was an abuse of that discretion. By attempting on direct examination to cloak these experts with the mantle of impartiality, defense counsel "opened the door" to prosecutorial inquiry as to the nature and extent of the suggested objectivity. Having presided over both phases of the trial, the judge was in a better position than we on an appellate court to appreciate the import of the extensive evidence that would at least support, if not compel, a lay conclusion that whatever appellant's mental state on the fateful day, it was not of the type to satisfy the statute's "right-wrong" test. Moreover, the judge undoubtedly recognized and appreciated the favor with which the law looks upon cross-examination as to bias and credibility, and, accordingly, the effect that has on a court's discretion to circumscribe its scope.

The majority opinion implicitly concedes the relevancy of the evidence sought by the cross-examination. It argues, however, that it was only cumulative, at best, and was otherwise "highly prejudicial." [4]

Certainly no grounds for a new trial exist because the trial court declined to circumscribe an inquiry into evidence that was merely cumulative. Under Rule 403, Minn.R.Evid., the only ground of exclusion applicable here is that the evidence's probative value is "substantially outweighed" by the danger of "unfair prejudice." For relevant evidence to be eligible for exclusion under Rule 403, Minn.R.Evid., the danger of unfair prejudice, or the needless presentation of cumulative evidence, must substantially outweigh its probative value. In the light of the extensive latitude the law affords to a party's right to cross-examine as to credibility, I cannot conclude that the trial court erred in failing to cut short the prosecutor's cross-examination on this issue and, most certainly, in my opinion, not so much as to justify the grant of a new trial. Apparently, even appellant's trial counsel did not consider the prosecution's cross-examination to be "unfairly prejudicial;" his only objection was on the ground of relevancy.

Moreover, even absent the prosecutor's cross-examination of these two witnesses, the trial record is replete with evidence to sustain the jury's verdict. Thus, even could I concede that the trial court abused its discretion in refusing to curtail the cross-examination, I would hold such error, at most, was harmless beyond a reasonable doubt. The defendant's own testimony, and the subjective and objective medical findings of examining physicians as well as those of the state hospital personnel indicate that, although appellant had undoubtedly suffered from depression following his stroke during surgery, his memory function was unusual for a stroke victim, and there existed no indication of disfunction in the limbic system (which, when damaged, may result in violent and uncontrollable rage reactions). Also, the evidence before the jury showed without dispute that appellant deliberately loaded into his Luger pistol a full ammunition clip, pocketed a second full clip, and went out to confront his estranged wife and a niece with whom she was staying. Moreover, the evidence demonstrated he knew that he had a lethal weapon, that it was criminal or wrong to shoot a human being with it, and that anyone who did so should be punished. Notwithstanding that understanding, he did empty the loaded gun clip of the Luger, fatally wounding his wife and seriously injuring two others before being subdued. In view of that overwhelming evidence, I cannot conclude other than that if the trial court committed error, the error was harmless beyond any reasonable doubt.

The jury heard all the evidence in both phases of the trial. It was fully apprised of the changes in appellant's mental and physical conduct following the stroke. No dispute exists that at the time of the tragic

---

**4.** I note the only objection raised by defense counsel at trial to the prosecutor's cross-examination of Dr. Stephans was that the information sought was "irrelevant." The record shows no claim that the evidence sought was unfairly prejudicial, nor did defense counsel impose a similar objection to the prosecutor's final argument, or seek any cautionary instruction. *See State v. Ture,* 353 N.W.2d 502, 516 (Minn.1984) (normally, a defendant's failure to object to improper statements made during final argument forfeits the right to consider the impropriety on appeal).

incident the appellant suffered a mental illness known as depression.[5] Yet, being privy to all that, the jury after being properly instructed on the law of the mental illness defense rejected appellant's claim. While it may be difficult for us to fathom their rejection of that defense, it just may be that they followed their jurors' oath and determined that at the time of the offense the appellant, notwithstanding his depression, did appreciate the nature of his act and that it was wrong. *See State v. Bott,* 310 Minn. 331, 333–34, 246 N.W.2d 48, 51 (1976).

No one who reads this record of a family tragedy can help but empathize not only with appellant but also with the entire family. While appellant's mental illness in one sense may have been, and most likely was, a causative factor in these events, he failed to establish what the law requires by a greater weight of the evidence—that he did not know the danger of his act or that it was wrong.

Because I conclude the trial court did not abuse its discretion in ruling on the prosecutor's cross-examination; because that cross-examination was directed toward delving into relative and probative evidence as to bias or partiality of the witnesses on a subject which had been opened up by the defense; and because even if the trial court did err in permitting the cross-examination, the error, in my view, was harmless, I would affirm.

COYNE, Justice (dissenting).

I join in Justice Kelley's dissent.

POPOVICH, Chief Justice (dissenting).

I join in the dissent of Justice Kelley.

---

5. At the time of the appeal appellant was being treated for his mental illness at the Moose Lake State Hospital.